Marion Lee AVERA and Daniel J. Avera, Claimants, Appellants,

v.

FLORIDA TOWING CORPORATION, Appellee.

FLORIDA TOWING CORPORATION, Appellant,

v.

Marion Lee AVERA and Daniel J. Avera, Claimants, Appellees.

No. 19387.

United States Court of Appeals Fifth Circuit.

Aug. 22, 1963.

Rehearing Denied Sept. 26, 1963.

---

Chester Bedell, Nathan Bedell, Thomas A. Larkin, Ralph E. Sistrunk, Robert P. Smith, Jr., Jacksonville, Fla., for appellants.

Herman Ulmer, Jr., Lewis Swift Lee, Jacksonville, Fla. (Ulmer, Murchison, Kent, Ashby & Ball, Jacksonville, Fla., of counsel), for appellee.

Before BROWN, GEWIN and BELL, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This appeal by the sole claimant in an insufficient fund limitation proceeding seeks reversal of a decree granting limitation of liability, 46 U.S.C.A. § 183 et seq. Challenged by the claimant is the basic holding that the negligence of the shipowner was without its privity or knowledge. Attacked also is the Court's earlier decision that only the tug had to be surrendered, not the barge being towed as well. Because of our decision on the privity question, we need not directly consider surrender of the barge. The case certainly proves that there are real hazards in allowing the liability and damage issues to be determined by a State Court jury reserving the question of limitation to the admiralty court. For the problem always exists, and certainly does here, of determining just what specific acts of negligence were committed against which the admiralty court subsequently applies the privity-knowledge yardstick.

The Claimant Avera was 17 years old at the time of his injuries. He joined the Tug EILEEN ROSS July 8, 1955. His entire career "before the mast" ended on July 21, 1955, when he lost a leg during docking operations of the Tug and the Barge NATCON II while making a temporary stop at Fernandina Beach, Florida. The circumstances of the injury may be severely capsulated. The Tug was towing the Barge on an 8-inch manila line. Avera under orders of the Tug captain was attempting to pre-vent the slack in the 8-inch towing line from becoming entangled in the Tug's propeller. While engaged in hauling in on the slack, the Barge overtook the stern of the Tug on the starboard side causing the tow line to become taut thus pinning Avera against the capstan. The operational actions occurring at the time of the injury are no longer of much moment since the tug owner does not now challenge the findings of such negligence. The sole significant issue is whether the negligence of hiring this young, green hand for this dangerous work was with the privity and knowledge of the tug owner. Briefly the tug owner says not, because only Coppedge, the president of the corporate shipowner, not the tug master, had the authority to hire crew members.

After timely commencement of a limitation proceeding, the fixing of a value of $22,500 for the Tug, and the refusal to order the Barge surrendered, the District Court pursuant to motion and stipulation of Avera entered an order allowing the prosecution of the claim in the Florida State Court. This order, followed the pattern of Petition of Red Star Barge Line, Inc., 2 Cir., 1947, 160 F. 2d 436, 1947 AMC 524, cert. denied, 331 U.S. 850, 67 S.Ct. 1741, 91 L.Ed. 1859, 1947 AMC 1015.[1] The order reserved to the admiralty court determination of the question of the right to limit, the Claimant expressly "waiving any claim of res judicata relevant to the issue of limitation of Petitioner's liability." At the same time the order affirmatively provided that the State Court " * * * judgment, or judgments," after becoming final, "shall * * * be res judicata in [the limitation] proceedings as to the issue of Petitioner's liability or nonliability to Claimants, and as to the amount of Claimants' respective damages * * *."

The case proceeded to trial before a jury in the State Court. That

---

1. See also Pershing Auto Rentals, Inc. v. Gaffney, 5 Cir., 1960, 279 F.2d 546, 1960 AMC 1287; Lake Tankers Corp. v. Henn, 1957, 354 U.S. 1447, 77 S.Ct. 1269, 1 L. Ed.2d 1246, 1957 AMC 1165.

Court directed a verdict on the separate count for unseaworthiness for insufficient evidence,[2] but submitted the cause to the jury under a general charge as to the tug owner's negligence.[3] A verdict for the plaintiff for $80,000 was returned. Under the subsequent pretrial order of the admiralty court, the limitation trial was restricted to determining whether any of the acts of negligence "set forth in the State Court's charge to the jury" were "committed with the privity or knowledge of the petitioner." [4]

■ On the evidence submitted to the state court jury, each and all of acts [1] through [5] inclusive were those necessarily committed to the immediate control and judgment of the tug master while the tug was underway. Consequently, the District Court was clearly right in holding that these acts were done without the privity or knowledge of the tug owner. The Claimant's attack is confined to [6] concerning the tug owner's negligence in "employing the plaintiff in a hazardous job with insufficient instructions, in view of the fact that the plaintiff was too inexperienced to alone perform safely without help and supervision" the task of keeping the slack line out of the propeller.

■ Without a doubt the whole case turns on [6]. It does so as to the sufficiency of the evidence showing that this was done (or omitted) with privity and knowledge. And from the tug owner's point of view, the interpretation of [6] becomes crucial in determining whether the issue of negligence in the *initial* employment of Avera was submitted to the state court jury at all. In connection with the latter, we quite agree with the tug owner that having sought the benefits of a permissive prosecution of the claim before a state court jury, the Claimant must bear the burdens of that stipulated order. Consequently, only those actions constituting negligence which were submitted to and impliedly found by the state court jury

2. Denial of the claim for unseaworthiness is not decisive. The claim for negligent failure to supply an adequate crew under the Jones Act is not synonymous with a claim of unseaworthiness even though each may overlap the other. See Vickers v. Tumey, 5 Cir., 1961, 290 F.2d 426, 1961 AMC 1173; Michalic v. Cleveland Tankers, 1960, 364 U.S. 325, 327, 81 S.Ct. 6, 5 L.Ed.2d 20, 1960 AMC 2251 citing our opinion in Cox v. Esso Shipping Co., 5 Cir., 1957, 247 F.2d 629, 1957 AMC 1927.

3. Where the jury trial allowed under the permissive order of the admiralty court, see note 1, supra, is to take place in a Federal Court, the use of a general charge coupled with interrogatories, F.R.Civ.P. 49, is both permissible and clearly advisable. See Tugwell v. A. F. Klaveness & Co., 5 Cir., 1963, 320 F.2d 866, note 2. Other courts have struggled with this situation. See Murray v. New York Central R. R., 2 Cir., 1961, 287 F.2d 152, A.L.R.2d 681, 1961 AMC 1118. Since the admiralty court may lay down conditions, it could also require in its order that the equivalent procedure be followed in any state court. This would make certain that the admiralty court could ascertain precisely the specific acts of negligence against which to match privity-knowledge.

4. The pretrial order quoted this pertinent portion of the state court charge in which we have inserted the numbers in brackets [1], [2], etc. to facilitate discussion:
"* * * that the defendant neglected through its servant, in [1] failing to keep a proper lookout and [2] in carelessly and negligently allowing the barge then towed to overtake and pass the tug boat and causing this injury. And/or further, ■ by the failure of the captain to order an experienced deckhand or another experienced crew member to assist the plaintiff. Marion Lee Avera, in taking in said slack line and to act as a lookout; and [4] the failure of the captain to warn the plaintiff of the danger involved in the handling of the tow line and in the failure to give adequate instructions to the plaintiff to safely carry out the handling of the line; and/or [5] by failing to properly instruct the plaintiff, Marion Lee Avera, in seamanship, ■ and employing the plaintiff in a hazardous job with insufficient instructions, in view of the fact that the plaintiff was too inexperienced to alone perform safely without help and supervision the instruction the captain had given him to keep the tow line from becoming entangled in the propeller, or wheel, or screw as it has been variously described."

can afford the basis for inquiry as to privity and knowledge.

■ We conclude that this issue was submitted in substance to the state court jury. The charge taken as a whole lends substance to this reading of [6]. So read it encompasses more than inquiry as to the simple activity which ought to have taken place just prior to the time Avera was given the job of handling the line. Several things point in that direction. The first is that the basic question of hiring a young inexperienced seaman as a deckhand for a tug of this kind was the subject of extensive evidence pro and con in the state court trial. The tug owner even proffered an expert who thought it proper since a young boy would acquire experience in a few day's time. Mr. Coppedge, the sole stockholder, manager-director of the corporation owning the tug was unable of accept this nice legal theory urged in his defense. He candidly told the state court jury that an 8-inch hawser was "too big for a kid his age and size." Furthermore, the Court's charge contained instructions on the duty of a shipowner.[5]

Perhaps most important, we think the admiralty court below was fully conscious that this was an important issue to be resolved. While reference in paragraph 3 of the District Court's findings [6] that "the above described alleged acts of negligence were faults chargeable to the failure of the" tug master, it is quite clear that the succeeding paragraphs 4, 5 and 6 all bore on the question of privity and knowledge. In paragraph 6 the Court discussed at length the circumstances under which Avera was hired by the captain without the knowledge or consent of Coppedge. All of this would have been superfluous had not the admiralty court considered this to be an independent specific act of negligence concerning which the tug owner had the burden of establishing lack of privity or knowledge.[7]

■ We must therefore examine Avera's contention that the admiralty court erred in concluding that the negligence in the initial employment of this young, inexperienced seaman was without the privity or knowledge of the corporate tug owner. In so doing, we make plain at the outset that we do not reject any fact findings under the clearly erroneous concept now applicable to admiralty appeals. Davis v. Parkhill-Goodloe Co., 5 Cir., 1962, 302 F.2d 489, 491, 1962 AMC 1720. Rather, we accept the findings of the District Judge, credit that testimony which he credited and reject that which he discredited. These findings and the other evidence as to which there is no real contradiction form the basis for our conclusions.

Thus we accept the testimony of Coppedge, the finding of the District Court that he alone could hire a new crew member, and that he had no knowledge until after the accident that Avera was a member of the crew of the tug. We likewise credit his testimony and that of others that Coppedge was the whole show. Coppedge was the owner of all of the stock of Florida Towing Corporation, the owner of the Tug EILEEN ROSS. He was the president, treasurer and one of its three directors, and the sole person who could utter a single authoritative word in its behalf. Others nominally holding corporate executive

---

5. See, e. g.: "I charge you that it is the duty of the owner of a vessel * * * to warn and instruct youthful and inexperienced seamen and where an employer * * * employs a young and inexperienced minor, it is the duty of the owner * * * to fully instruct the seaman as the dangers incident to his employment. * * *."

6. The Court quoted and referred to the excerpt from the charge set forth in note 4, supra.

7. The Court concluded this portion of the findings with the holding that "until after said accident had occurred, * * * Coppedge, the only managing officer and agent of the corporation, had no knowledge or privity, and no means of knowledge or privity, of the fact that Captain Moore had, without authority, engaged the Claimant as a deckhand on said tug * * *."

offices or serving as directors frankly acknowledged their complete corporate impotence. In addition to Florida Towing Corporation, Coppedge was also the sole owner, stockholder, guiding force, officer and director of Coppedge Investment Company, Coppedge Transportation Company, Coppedge Terminal Company, Florida Fresh Water Company. And just a couple of months before the accident, he had taken on new management responsibilities and an ambiguous status both individually and for and on behalf of each of these assorted corporations as a managing agent for American Coastal Lines, Inc.

 American Coastal Lines, Inc., a Massachusetts corporations, owned by outsiders had become heavily indebted to the Coppedge companies. The management contract was just one of the steps leading toward Coppedge's ultimate ownership of American Coastal as well as performance by his companies of transportation for National Container Corporation. American Coastal had a contract carrier permit under the Interstate Commerce Act, 49 U.S.C.A. §§ 901, 909. For some time it had acted as contract carrier for National Container in the transportation of paper products from Jacksonville to New Jersey. National Container owned a specialized tugboat and the two Barges NATCON I and NATCON II. Since towage of National Container's barges carrying its cargo would constitute transportation under Part III of the Act, 49 U.S.C.A. § 902

(e), (f), (h), it was essential that there be a certificated ICC contract or common carrier. Coppedge as general manager of American Coastal entered into a 30-day letter-charter with National Container covering the Barge NATCON II. Coppedge as president and general manager of Florida Towing Corporation then entered into a "verbal agreement" with himself or his assorted companies as general manager of American Coastal to charter the Tug EILEEN ROSS at the rate of $10,000 per month. The management contract with American Coastal granted "the full management and control of said Coastwise Division and all of the authority respecting said Coastwise Division, which Coppedge would have if he were the owner thereof." More important, it gave Coppedge a fixed percentage of the profits and expressly imposed on Coppedge all operating losses of any kind or character "within or without the control of Coppedge." Coppedge was, therefore, much more than a mere agent. Standing to gain profits and suffer losses, the arrangement had all of the business characteristics of a vessel owner trading on his own behalf. This and the fact that the bargee on the NATCON II was in the direct employment of Florida Towing Company [8] might well be enough to require the surrender of the Barge as well [9] up to its full value.[10]

 Among the other things occupying Coppedge's attention at this time were negotiations between the stock-

8. Florida Towing Corporation put its own employee aboard as bargee, paid his wages and instructed him as its employee, thus in fact manning the barge as though owned or chartered to it.

Where one standing in a substantial relationship of a charterer puts a bargee aboard the barge, it mans, victuals and navigates the vessel, and therefore has the responsibility of the owner. 46 U.S.C.A. § 186. The Martha R. Grimes, S.D.N.Y., 1943, 49 F.Supp. 591, 594, 1943 AMC 191.

9. Avera contends that the Court erred in not requiring surrender of the NATCON II. Though we do not decide the matter, Coppedge stood in substantial relation to

this barge as an owner or charterer, 46 U.S.C.A. § 186. There is considerable authority for the next step that in a suit brought by a crew member asserting legal liabilities arising out of the contractual relationship of ship and seaman, both tug and barge would have to be surrendered. Certainly that seems true in the Second Circuit: United States Dredging Corp. v. Krohmer, 2 Cir., 1959, 264 F.2d 339, 1959 AMC 2664; Deep Sea Tankers v. The Long Branch, 2 Cir., 1958, 258 F. 2d 757, 773–774, 1959 AMC 28; Standard Dredging Co. v. Kristiansen, 2 Cir., 1933, 67 F.2d 548, 1933 AMC 1621. We have

holder owners of American Coastal for the purchase of all of the stock of that company and likewise the purchase of the NATCON I and NATCON II,[11] as well as a specialized tugboat from National Container, all of which ultimately took place though after the accident of July 21, 1955.[12]

In all of this myriad of activity, Coppedge or his companies employed in the neighborhood of 200 persons who were engaged in a variety of activities. Through one form of legal entity or another, he or his companies were engaged in the operation of a considerable number of vessels. By his own words, he was the only person entitled to make "management and policy decisions for Florida Towing Corporation" or the other companies. He alone was authorized to purchase or charter "a tugboat or a barge for the company." No one else had authority to undertake towing jobs in behalf of the enterprises, or to establish prices or charges for any such services. He alone was the sole person having authority to instruct tugboat captains concerning towing jobs to be performed or where tugboats were to be sent. He and no one else had authority to hire secretaries, bookkeepers, clerical workers for the office. He was the only person entitled to sign checks on the checking account of the various corporations. He alone had the authority to hire crew members for the company's tugs. He and he alone had sole responsibility "to make sure that a vessel * * * has a full and competent crew before it sets out on a voyage." And the tug captains, including the master of the EILEEN ROSS were under "standing instructions" to contact Mr. Coppedge if they found themselves to be without a full and competent crew.

While departure of a tug on a voyage necessarily restricted his operational activity, Mr. Coppedge expected his tug captains while underway and while in distant ports to report to him personally by radio telephone at designated points and time. The captains were without authority to make unscheduled dockings, such as those made at Fernandina Beach,

also so held, see Sabine Towing Co. v. Brennan, 5 Cir., 1934, 72 F.2d 490, 1934 AMC 1122, cert. denied, 293 U.S. 611, 55 S.Ct. 141, 79 L.Ed. 701; but compare Oil Transport Co. v. Verret, 5 Cir., 1960, 278 F.2d 464, 468, note 5, 1961 AMC 2061. See also Sacramento Navigation Co. v. Salz, 1927, 273 U.S. 326, 47 S.Ct. 368, 71 L.Ed. 663, 1927 AMC 397; Liverpool, Brazil & River Plate Steam Navigation Co. v. Brooklyn Eastern District Terminal, 1919, 251 U.S. 48, 40 S.Ct. 66, 64 L.Ed. 130.

10. Though precedents are scarce, the value to be surrendered or bonded by a bareboat charter is the same as that exacted of an owner. See Petition of McAllister Bros., E.D.N.Y., 1951, 96 F. Supp. 575, 577, 1951 AMC 967. "[I]t would seem to be only common sense that if a charterer wishes to be treated as an owner *pro hac vice* in order to limit his liability, he must stand in the shoes of the owner in respect of the amount of value surrendered. The owner's right to limit carries with it a reciprocal obligation, and so, to the same extent, should that of the charterer." See also Thorp v. Hammond, 1871, 79 U.S. (12 Wall) 408, 417, 20 L.Ed. 419.

11. At the time the NATCON II was chartered by American Coastal from National Container, the charter provided that Florida Towing Corporation was to be given credit for any charter hire paid in the event the barge was ultimately purchased. It was purchased, and this credit was given even though the purchase was ultimately made by Coppedge Terminal Company, not Florida Towing Corporation.

12. Obviously the tug owner may not be charged with privity or knowledge by reason of subsequent actions. But these subsequent events in the setting of the undisputed record are relevant in showing the nature and extent of Coppedge's activities on and prior to July 8–21, 1955, as well as the complex confusion of these closely interrelated operations. See Space Controls, Inc. v. Commissioner, 5 Cir., 1963, 322 F.2d 144 note 24. "While subsequent events are not determinative of a fact on a given date prior thereto, that which occurred * * * confirms what would have been a reasonable expectation at that time * * *." Lucker v. United States, Ct.Claims, 1931, 53 F.2d 418, 424; C-O-Two Fire Equipment Co. v. Commissioner, 3 Cir., 1955, 219 F.2d 57.

without the personal permission of Mr. Coppedge. Likewise under standing instructions they were expected to use two deckhands while docking or undocking though this was not in fact done after dropping crew members off at Fernandina Beach.

It was in this setting that Captain Moore of the Tug EILEEN ROSS hired young Avera on the afternoon of July 8, 1955. Captain Moore hired Avera because the Tug was short one deckhand. Though Captain Moore was within easy walking distance from the pier to Coppedge's office located on these properties, he made no report to Coppedge's nearby office. Coppedge did not go aboard the Tug that afternoon nor did he learn of Avera's presence until receipt of telephone advices about the accident July 21. Though Coppedge acknowledges that he and the captain were in frequent contact by ship-to-shore radio during the voyage, no mention was ever made about Avera's presence. Except to formally acknowledge as a witness that he had no "authority" to hire Avera, Captain Moore's conduct in no way indicated that he was conscious of violating any rule. There was no furtive effort to conceal Avera's presence.

Coppedge had no system for determining who was aboard the various vessels except by reading the vessels' logs when and as mailed to the office for payroll purposes. But these were not mailed unless and until mailing facilities were available on or after the 1st and 15th of the month. The payroll log for this voyage was delivered after arrival of the Tug in Jacksonville. Only the initial hiring was left to Coppedge. He recognized that while he made "arrangements" for "regular relief men" to man the EILEEN ROSS and other boats, the Corporation was fully aware that the men were permitted to, and did, "swap trips" with one another without notice to or permission from Coppedge.

The question is therefore raised whether Coppedge as shipowner can satisfy the legal obligations imposed by law by taking unto himself every responsible activity and decision and by the use of standing instructions without more insulate himself from knowledge of facts which he would quickly learn had he established even the most rudimentary system to police compliance.

This case has an unusual twist. Unlike Admiral Towing Co. v. Woolen, 9 Cir., 1961, 290 F.2d 641, 1961 AMC 2333 on which Avera so strongly relies, this is not the situation in which a master is given broad authority to do some act such as man and supply a vessel for a specific voyage.[13] In that situation there is at least some basis for the suggestion that the scope of authority delegated by an owner to a subordinate servant may be so broad as to justify imputing privity as well as knowledge. See In re Great Lakes Transit Corp., 6 Cir., 1936, 81 F.2d 441, 444, 1936 AMC 267; In re New York Dock Co., 2 Cir., 1932, 61 F.2d 777, 779, 1932 AMC 1492, referred to in Coryell v. Phipps, 1943, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363, 1943 AMC 18.

But here we deal with a case in which the master is a nobody, and the president-sole-stockholder-director-manager is the whole works. Far from committing to the tug master the selection of the crew, the shipowner contended, and the Court found, that no one but Coppedge himself could hire even the most lowly messboy. On these findings, when the tug master hired Avera, he was certainly not carrying out one of the specific duties entrusted to him.

Of course decision would be easy if the record revealed that despite Coppedge's instructions, the tug master frequently employed crew members without consultation or notice. But that is not present here either, and certainly not in the sense of specific instances of such derelictions.

13. The 9th Circuit was especially careful not to adopt the broad view suggested by Gilmore & Black, Admiralty, § 10–24, pp. 701–704 (1957), that privity and knowledge for a corporate shipowner is equated with nondelegable duties. See 290 F.2d 641 at 648, and note 6, p. 649.

But we do not think it need be so simple. It is one thing to set up a whole list of prohibitory instructions of the kind which surrounded Coppedge's staff. No one could do anything but the most trivial, menial, routine, clerical act. Management and execution were all wrapped up in this one man who simultaneously wore the garb of an assorted half dozen wholly-owned corporations. But it is quite another thing to operate in the context and framework of such an artificial structure without establishing an adequate system of policing to see to it that such instructions are carried out in fact. Anything less would allow an entrepreneur to establish a number of corporations, embrace exclusively to himself each and every conceivable significant operational activity, and then insulate himself against learning whether his instructions are being faithfully carried out. Certainly is that so as to operational or decisional activities which occur while the vessel is not only in port, but located within sight and sound of the owner's command post.

■ There is something fundamentally contradictory about the shipowner's position here. It claims that the tug master had no authority to hire Avera. Yet in the state court and in the limitation petition, it formally admitted that Avera was an employee to whom wages were due and paid, to whom maintenance and cure were due and paid, and to whom legal obligations were also owed under the Jones Act, 46 U.S.C.A. § 688, and the maritime law. Likewise, it is at least odd that under Coppedge's instruction a thing as important as the skill and competency of the tug's crew is to be judged wholly and exclusively, not by the master to whom the law looks as the Lord of the Quarterdeck, United Geophysical Co. v. Vela, 5 Cir., 1956, 231 F.2d 816, 819, 1956 AMC 745; Ionion S. S. Co. v. United Distillers, 5 Cir., 1956, 236 F.2d 78, 82, 1956 AMC 1750; June T., Inc. v. King, 5 Cir., 1961, 290 F.2d 404, 1961 AMC 1431; The Balsa, 3 Cir., 1926, 10 F.2d 408, 409, 1926 AMC 451; The Lusitana, S.D.N.Y., 251 F. 715, 728, but rather by a land-based and more remote sole stockholder and corporate manager.

Before the tug master could be bypassed so easily, we think the trial Court had to consider whether there was any real effort by the shipowner to ascertain whether this whole myriad of restrictive prohibitory instructions were being given the slightest heed. If in fact other instructions bearing on operations of the tugs were being ignored, it would establish at least two things. First, it would show that instructions were issued just as an unavoidable element of one-man rule. And second, it would indicate that employees from lack of management follow-up or discipline would have a practical basis for concluding that instructions really didn't matter.

Here the record shows without contradiction at least two such instructions, and one of which bore directly on the injury to Avera. One was prohibiting unscheduled stops, the other requiring two deckhands on docking. At the time of the accident the tow was putting into Fernandina Beach, approximately a five-hour run above Jacksonville. This was being done to let a crew member off so that he would have a longer stay ashore during the tug's turnaround for the northbound trip. Doing this meant that on arrival of the flotilla at Jacksonville, the crew would be shorthanded and only one deckhand would be available to handle lines. These practices were shown to have been frequent and common. And yet Coppedge professed—with evident sincerity and honesty which we may fully credit—that he knew absolutely nothing of it. The proof shows that an examination of the logs and the most casual observation of actual operations while docking in Jacksonville at the end of such southbound trips would have revealed that the instructions were not being heeded.

Out of the context reflected by findings of the trial Court which we accept and by uncontradicted proof, this question of law then arises: is it enough for such tug owner merely to issue instructions?

Gearing the answer to the specific and most extraordinary facts of this record, we think the answer is in the negative. We thus agree with the approach that "the more restricted the operation in which a vessel is engaged, the greater will be the degree of control which the corporate owner will be required to exercise over master, crew and subordinate shoreside employees." Gilmore & Black, Admiralty § 10–24, p. 704 (1957). We also agree with the statement that "The proposition that the duty to control increases along with the possibility of control is borne out by a notable Supreme Court decision of the early thirties." The case, of course, is the celebrated one of the Linseed King (Spencer Kellogg & Sons v. Hicks), 1932, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903, 1932 AMC 503. In that case the company ferried employees across the Hudson River from New York City to New Jersey. The small motor launch was concededly unseaworthy to run through ice. Management had given Stover, the works manager, "definite and positive instruction" that the boat should never be run through ice. The record did not show that Stover knew that the launch would be operated on the day of the catastrophe. Affirming a denial of limitation of liability, the Court had this to say. "In view of the weather conditions and the observation of ice in the river some days prior to the accident by several witnesses, amongst them one of Stover's own subordinates, he should not have rested upon the mere instruction to the master not to run through ice. Before allowing the ferriage operation he was under obligation to assure himself by inquiries or by personal inspection that the 'Linseed King' should not incur the hazard of colliding, as she did, with ice floes in the river." 285 U.S. 502, 510, 52 S.Ct. 450, at 452.

The Court then answered the shipowner's contention which paraphrases that made here. "It is said that the master, admittedly competent, had definite and positive instructions not to run through ice; that when he encountered ice on his trip from the New Jersey shore, it became his duty at once to abandon the trip and return to the * * * plant. The argument is that as the boat was seaworthy when there was no ice and instructions had been given to a competent master not to run her through ice, the owner did its full duty and cannot be held responsible as having privity or knowledge of a violation by the master of these explicit instructions." 285 U.S. 502, 511, 52 S.Ct. 450, 452. Rejecting this argument and cases such as LaBourgogne (Deslions v. La Compagnie Generale Transatlantique), 1908, 210 U.S. 95, 28 S.Ct. 664, 52 L.Ed. 973, the Court went on. "But there is a vast difference between the cases relied on and the instant one. The launch was used for ferriage over a distance of about a mile and a third. * * * There is no analogy between such a situation and that presented in the cited cases where the emergency must be met by the master alone. In [such cases] there is no opportunity of consultation or cooperation or of bringing the proposed action of the master to the owner's knowledge. * * * The conditions on the morning in question could have been ascertained by Stover, if he had used reasonable diligence, and * * * the negligence which caused the disaster was with his, and therefore with the owner's, privity or knowledge." 285 U.S. 502, 512, 52 S.Ct. 450, 453.

The crucial thing there, as the crucial thing here, is whether the shipowner's duty is restricted to the issuance of instructions. For it is uncontradicted that had Coppedge undertaken "to assure himself by inquiries or by personal inspection * * *", the presence of Avera as a crew member would have been disclosed. Coppedge was, of course, in his office located on property which included the dock to which the tug was moored. Either a visit on board the tug, inquiry of the tug master while aboard or in Coppedge's office, or through the marine ship-to-shore radio telephone would have revealed the presence of young Avera.

With the duty to make inquiry "the measure" of the knowledge "is not what the owner knows, but what he is charged with finding out." Great Atlantic & Pacific Tea Co. v. Brasileiero, 2 Cir., 1947, 159 F.2d 661, 665, 1947 AMC 306. For " * * * knowledge means not only personal cognizance but also the means of knowledge—of which the owner or his superintendent is bound to avail himself—of contemplated loss or condition likely to produce or contribute to loss, unless appropriate means are adopted to prevent it." The Cleveco, 6 Cir., 1946, 154 F.2d 605, 613, 1946 AMC 933.

Once we hold that Coppedge, as did Stover in Linseed King, had the duty of making inspection and inquiry, it follows without any question that through him the corporation is chargeable with privity and knowledge of Avera's incompetency and the tug master's negligence in taking him aboard as deckhand without first giving him adequate instruction. Mr. Coppedge was himself emphatic that a 17-year-old boy without experience on board tugs and barges had no business trying to handle an 8-inch manila hawser. Whether viewed in terms of negligent unseaworthiness from incompetency or inadequacy of the crew, Admiral Towing Co. v. Woolen, supra, or negligence in the hiring of a green, inexperienced, young 17-year-old boy without adequate instruction, see Davis v. Parkhill-Goodloe Co., 5 Cir., 1962, 302 F.2d 489, 1962 AMC 1720, the fault in allowing Avera to sail with the tug and his injury occurring on the end of that voyage are all chargeable to the corporate shipowner as its acts done or omitted with its privity or knowledge.

Accepting, as we do, all of the Court's fact findings, we nonetheless conclude in the context of the uncontradicted facts of this record, that when this single person undertook to manage and direct every significant act relating to the operation of his multiple enterprises and especially all of the activities of all of the vessels of his relatively large fleet while in the home port of Jacksonville, he had the obligation to police compliance with prohibitory instructions and from his failure to do so, he, and through him, the corporation, must bear the consequences of what inquiry would have revealed. On the jury findings, stipulated to be *res judicata* on the issue of liability and the evidence heard by the admiralty Judge, the Court should therefore have entered a decree denying limitation of liability.

Reversed and remanded.