Petition of L. Henry READ, Jr., and B. Devereaux Barker, Jr., for Exoneration from or Limitation of Liability as Owners of the YACHT MERIDIAN, No. 237391.

**No. 2080–ADM.**

United States District Court
S. D. Florida.
Dec. 5, 1963.

See also D.C., 200 F.Supp. 504.

242

Richard Ralph, Miami, Fla., for petitioners.

Nichols, Gaither, Beckham, Colson & Spence, Miami, Fla., for claimant.

DYER, Chief Judge.

This is a proceeding in Admiralty on a Petition for Limitation of or Exoneration from Liability, 46 U.S.C.A. §§ 181–195, filed by L. HENRY READ, JR. and B. DEVEREAUX BARKER, JR., as owners of the yacht "MERIDIAN." GEORGE PENNELL answered the Petition and filed claim for personal injury, no other claimants having appeared and their default having previously been noted. The facts are not in dispute.

The Petitioners each owned equal undivided fifty per cent shares in the two-masted auxiliary yacht "MERIDIAN", an American pleasure yacht, Official No. 237391, registered length 52.4 feet; breadth 14.2 feet; depth 5.9 feet, of 28.-13 gross and 19 net tonnage.

Petitioner BARKER was a resident of Massachusetts and Petitioner READ, a resident of Florida. Each of the owners had equal control of the yacht and authority to act for the other when the yacht was either in Florida or Massachusetts waters. Immediately before, and at the time of the accident, the vessel was in charge of Petitioner READ, acting as its co-owner and Captain for the purpose of making it ready for and participating in the Miami-Nassau race of January 30–31, 1961.

In addition to the capstan deck winches, the "MERIDIAN" was equipped with a pedestal winch designed by Sparkman & Stevens, Inc., naval architects specializing in yacht design, and manufactured by Nevins. This winch was located in the after part of the deck aft of the mizzenmast on the midline. The drum of the winch was aft of the pedestal. The horizontal drum had two opposing notches or fairleads on opposite edges of the drum cover and a wood cleat riveted in the center of the cover. The drum operated on a roller bearing on a vertical shaft. The drum is driven in a clockwise direction by a chain drive to a sprocket that engages through ratchet pawls in the base of the drum. Fixed pawls in the base of the drum under spring tension acting on a camed surface lock the drum to prevent counter-rotation.

The chain drive to the drum sprocket is driven by a sprocket attached to the base of a vertical shaft contained in the pedestal. This vertical shaft extends from the pedestal base to the top housing and a rack with two concentric rings of bevel gears connected to the vertical shaft. Running fore and aft across the center of the vertical end of the shaft is a horizontal crankshaft to which arms are attached on the outside of the housing to the fore and aft ends of the crankshaft. At the end of each is a wooden handle which revolves on handle pins affixed to the respective arms. On the horizontal crankshaft are two bevel gears, ratchet sleeves and a compression spring between.

The housing cover has an indicator which pivots in a horizontal plane. This lever-indicator actuates a yoke which moves through a partial distance along the axis of the crankshaft engaging the aft ratchet sleeve, moving it in or out to engage or disengage the aft bevel gear. The lever-indicator in its forward position gave the forward handle a ratcheting action on a port to starboard rotation and a lower drum speed in relation

to crank rotation. With the lever-indicator in the aft position the forward handle would rotate in the same direction for the same low drum speed; the port to starboard rotation would be changed from ratcheting to a high drum speed in relation to crank rotation.

In January, 1961, Claimant PENNELL was twenty-five years of age and resided with his parents in West Palm Beach, Florida. He had completed two years of college. He had sailed and raced small sail boats and had done some day cruising on a thirty foot sail boat, but he had never before participated in an ocean going race.

Claimant drove to Miami from West Palm Beach on January 29, 1961, hoping to get a berth on one of the yachts sailing in the Miami-Nassau race. In the words of the Claimant, he wanted to participate in the race for the sport of it and for his personal pleasure because he liked to sail. That evening he sought out vessel owners in an attempt to get their permission for him to go aboard, but to no avail.

He slept in his car that night, and on the morning of January 30, 1961 (the day the race was scheduled to commence) he approached B. DEVEREAUX BARKER III, the son of one of the Petitioners, who was on the "MERIDIAN" then moored at the Coral Reef Yacht Club. Claimant discussed his desire to participate in the race and his sailing experience with BARKER, who was about the same age as Claimant. BARKER thought Claimant would be campatible with the others on board and had sufficient experience, so after discussing the matter with Petitioner READ and receiving his permission, Claimant was invited aboard the "MERIDIAN" for the race. The "MERIDIAN'S" classification as to size and sail was Class A in the race, this class being for the larger vessels.

The yacht had ten persons aboard, all being older than BARKER III and Claimant. Seven were friends, business associates or acquaintances of Petitioner READ, and the eighth was STUBBS, a Bahamian, who was the only "hired hand" on the yacht. Petitioner READ had known him for some twenty years and had used him on many other occasions.

Except for STUBBS none of the other persons, including Claimant, were promised or received monetary payment or other consideration for duties performed on the vessel. In fact, Petitioner READ expected to cruise the Bahamas with the "MERIDIAN" following the race, and all persons aboard were to make their own arrangements for their return to Miami.

Before leaving the yacht club, a mechanic, at the direction of Petitioner READ, installed a new compressor unit in the refrigerator. He then checked the lubrication of the pedestal winch by turning it and then removing the covering between the pedestal and drum, exposing the chain. He cleaned off the grease and re-greased it by revolving the chain without removing the drum or otherwise dismantling the winch.

The drum had last been removed the preceding June or July by personnel of a marine yard in Marblehead, Massachusetts, at which time the winch was dismantled, checked and lubricated and no parts replacement was reported or billed.

The "MERIDIAN" was equipped with a ship-to-shore radio which was operative and various items were checked in connection with check lists preparatory to the race.

The pedestal winch had no history of difficulties, abnormalities or malfunctioning. The vessel had been in the Lipton Cup Race the Saturday prior to the Miami-Nassau Race and the winch operated without fault.

Petitioner READ furnished the food for consumption during the race, and it was, of course, contemplated that all of those aboard, including the Claimant, would participate and assist in the sailing of the vessel during the race.

The "MERIDIAN" left the yacht club and proceeded to try various sails in the

vicinity of the starting line. Claimant had helped bag sails before leaving and assisted in adjusting some stays. Shortly after the race started, Claimant became seasick and spent the night below. About eleven o'clock the next morning, January 31, 1963, he came on deck and appeared recovered.

About four o'clock that afternoon, Petitioner READ proceeded to the port side of the winch to trim the Genoa. BRUCE, who had sailed the "MERIDIAN" many times and who had previously been assigned to handle the winch, followed and about when he had reached the mizzenmast, Claimant, who had been lying down on the deck on the port side, got up and went to the starboard side of the winch. The last major tack had been made about fifteen minutes before, and the "MERIDIAN" was on a course to Nassau on a port tack. The sea was moderate, with the wind about fifteen knots.

The sheet from the Genoa, through various leads on the starboard side, was wrapped three or four times around the drum and thence through one of the fairleads on the drum lid rim and secured to the drum cleat.

Petitioner READ on the port side and Claimant on the starboard side proceeded to crank the winch for some ten to forty seconds to take in the Genoa sheet slightly to trim the luff of the sail. Having completed the operation, Petitioner READ turned and moved forward, and Claimant either seated himself or was bent over in the process of sitting down when the forward handle spun at great speed striking him in the face and forehead, propelling him against the starboard lifeline.

The Genoa sheet was intact and had run out only about two or three inches. The cleat had not pulled out but was fractured with the sheet still around it. The sheet was readjusted with the pedestal winch which operated properly.

First aid was administered to Claimant and an attempt to reach Nassau by radio was unsuccessful although sufficient output and power source was indicated. Another vessel was hailed within a few minutes and reached Nassau by radio. Shortly thereafter the "MERIDIAN" met a power boat with a doctor aboard which had been dispatched from Nassau, but since the "MERIDIAN" could make better time than the power boat and because of the difficulty of transferring Claimant at sea, the "MERIDIAN" continued to Nassau with Claimant aboard, arriving about six that evening. Claimant was transferred to another boat in the harbor and thence taken to a hospital.

### Was Claimant a Seaman or Crew Member Employee?

As has been earlier noted, Claimant came to Miami seeking to participate in the Miami-Nassau race for the sport of it and for his personal pleasure because he liked to sail. He was not paid or promised a wage or salary nor return transportation from Nassau. This was no commercial venture but involved amateur participants in a pleasure yacht race, a rather common custom in connection with yacht racing in this country. In this context then, was Claimant a seaman, entitled to a warranty of seaworthiness or a crew member employee within the purview of the Jones Act?

The question posed is a novel one. The Petitioners assert that there was no employee-employer relationship necessary to either a Jones Act application or seaworthy warranty, while Claimant contends that he was doing seaman's work subject to Petitioners' control and was therefore an employee.

Petitioners' position in short is that one cannot be considered a seaman unless there is a *commercial relationship* coupled with services in connection with the navigation of a vessel. There being no commercial relationship here, Claimant was a guest or co-adventurer.

Petitioners rely upon Murphy v. Hutzel (E.D.Pa.1939) 27 F.Supp. 473, in which the respondent was the owner of a gasoline launch which he used as a pleasure boat for the entertainment of him-

self and his friends. A number, including the libelant and his wife, had been invited by the wife of respondent to a crabbing party. During this occasion, the tide went out causing the launch to list, and while waiting for the turn of the tide an anchor was thrown out and the party amused themselves swimming and crabbing until the launch was again afloat. The libelant was asked to trip the anchor and while in the act of doing so the respondent turned a switch causing a fire. The Court dismissed the libel for laches but commented by way of dicta, as follows:

"The relation of the owner of a boat and those invited to join a junketing trip on her is often a peculiar one. The boat must be managed, and otherwise guests, if familiar with the handling of boats, act as members of the crew. Such was the case here, and libelant was hurt while acting as a member of the crew. The host and guests were common adventurers, much as if two or more together hire a boat. They are both hosts and guests."

The dicta is not helpful. The libelant in that case was not aboard to perform duties as a seaman, but to go crabbing. The assistance he rendered was voluntary, not under orders, and while incidental to a fishing excursion in which it was not expected that he would undertake the responsibilities of a seaman.

Petitioner likewise relies on Eytinge v. Berri (S.D.N.Y.1936), 1936 A.M.C. 1699, affirmed, (2d Cir. 1937), 89 F.2d 1006, and Kanischer v. Irwin Operating Co. (5th Cir. 1954), 215 F.2d 300.

In Eytinge the libelant was a mechanic who had raced a boat belonging to the owner previously and had made a record run with it. Later he induced the owner to enter it in a race during the course of which the boat hit the wake from a tug, struck a pier and injured libelant. The court said:

"The facts in this case satisfy me that more than the relationship of host and guest was established by the conditions under which the libelant and respondent participated in this race. I feel that it was a joint venture on the part of both of them. Eyting had the record. He was a sportsman, and had wanted to defend it, and he did not have a boat or he did not have control of this boat, so that he could defend it. He recognized in Mr. Berri a man who was also a sportsman because Berri had purchased and maintained this boat and had permitted Eyting to race it or accompany him on previous occasions, and had made an appeal to Mr. Berri to put the boat in this race, and had banked his appeal on the ground that it would be unsportsmanlike having a record, not to go in there and defend it."

\* \* \*

"Both of these parties knew the dangers which were likely to be encountered. \* \* \* I am of the opinion that regardless of the negligence of the respondent Berri, it was such a relationship between these parties that in undertaking this venture each of them went into it obvious of its dangers, that there was an assumption of its risk and no recovery can be had."

In Kanischer the Plaintiff's leg was cut by the propeller of an 18-foot inboard motor boat while he was attempting to hold it off the beach at the conclusion of a fishing trip with the owner. The Court held:

"Kaplan (the owner) wanted to go pleasure fishing. He wanted to take two young friends pleasure fishing. He wanted appellant to go with him; and you may call it either as a guest or as one to assist with the boat. It makes no difference. On the day in question, appellant was not a member of the organized personnel or crew of the ship. We do not think Congress ever intended the Jones Act to cover two or three friends duck hunting in a skiff or fishing from a privately-owned non-

commercial 18-foot speed boat, even though on navigable waters."

While it is true that there was no commercial employment in either of these cases, they hardly stand for the proposition that in no event may one be considered a seaman unless a monetary consideration has been paid.

■ Claimant was not a volunteer or an interloper. Nor was he a guest invited aboard just for the ride. He was neither a friend nor acquaintance of the Petitioners but had represented to one of them that he had sufficient sailing experience to be a member of a crew—and he came aboard for the very purpose of aiding in the navigation of a vessel. Indeed there can be no question but that he was performing the function of a seaman at the time he was injured. Lack of long continued attachment to the vessel does not serve to deny him the status of a seaman when he is injured while assigned to and performing normal crew service. Mach v. Pennsylvania Railroad Company (3rd Cir. 1963), 317 F.2d 761.

■■ Whether or not an employee-employer relationship existed is to be determined by common law tests. This relationship is the same as that of master and servant. In common law, four elements were considered in making a determination of this question, i. e., the selection and engagement of the servant, the payment of wages, the power of dismissal, and the control of the servant's conduct; the essential element being the right of control and the right to direct the manner in which the work shall be done, the payment of wages being the least important factor. 35 Am.Jur., Master and Servant, Section 3, pgs. 445, 446.

■ Consideration is not necessary to create the relation of principal and agent and it is not necessary in the case of master and servant. The Restatement, Agency 2nd 225, pg. 497.

Many cases involving "student yard clerks" who worked for railroads without compensation have recognized that when the element of control was present, lack of monetary consideration did not preclude the existence of master-servant, employer-employee relationship under the Federal Employers' Liability Act, which, of course, is specifically incorporated into the Jones Act. See Watkins v. Thompson, R. (E.D.Mo.1947), 72 F.Supp. 953, and the cases collected therein; and to the same effect, Southern Pacific Co. v. Libbey (9th Cir. 1952), 199 F.2d 341.

A rather close analogy can also be drawn from the cases involving the "workaway" hired on for nominal wages in which they have been held to be seamen as a matter of law. The Tashmoo (E.D.N.Y.1930), 48 F.2d 366.

Walliser, et al. v. Bassett, Deputy Commissioner, etc. (D.C., E.D.Wis.1939), 33 F.Supp. 636, was decided on a factual situation in many respects parallel to this case. The owners of a sailing yacht entered her in a race between Chicago and Milwaukee. The decedent, who had formerly been in the owners' employ but had obtained other employment, desired to go along on the race and the owners were willing that he do so but the decedent could not afford to lose time from his regular employment so the owners agreed to give him $10.00 so that he would not sustain any loss during the race. There were six other men on board besides the owners, all of whom were volunteer members of the crew. The decedent's duties were chiefly to do the necessary cooking during the race and to do any repair or maintenance necessary.

While the yacht was about seven miles off the coast of Wisconsin, one of the owners who was handling the tiller called for assistance in trimming the sail, without naming any person in particular. The decedent was below deck and having heard the call came up to render assistance, and in going toward the stern fell overboard and was drowned.

The Court said:

"We conclude that Jonasson (decedent) was a member of the crew of the yacht 'Revenge' at the time of his death. * * *"

Upon the foregoing considerations, I find that at the time of his injury the Claimant was a seaman and crew member employee.

### Was there Negligence?

Having found that the Claimant was a Jones Act seaman, it is unnecessary to pursue his alternate contention that in any event he was lawfully aboard the vessel for purposes not inimical to the owners' legitimate interests. Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550.

The locking device on the drum of the pedestal winch consisted of six roller pawls which acted as wedges on a camed surface of the drum locking it so that it could not turn counterclockwise. The Genoa which was being trimmed at the time of the accident exerted a pressure of some two to three tons.

The winch had operated perfectly prior to the accident and, without any changes or repairs except the straightening of the forward handle bent by the accident, was used for about a year afterwards without incident.

Petitioners were not aware of any similar occurrence on other vessels and Olin Stephens, of Sparkman & Stephens Naval Architects, specializing in yacht design, who supervised the design of this pedestal winch, knew of only one accident involving a similar winch, the cause of which was not determined. Pedestal winches of the same design are used on twelve-meter boats sailing in the America Cup Race. They are, of course, larger in size and sail area than the "MERIDIAN."

There is a sharp conflict in the expert evidence as to the cause of the unexpected counterclockwise movement of the drum and handle on the pedestal winch which caused Claimant's injuries.

The winch was dismantled and inspected in Nassau on February 1st or 2nd following the accident by Petitioners' expert, Clifton Handy, a qualified naval architect and marine engineer. He found it to be in perfect condition and operating order except, as a result of the accident, the forward handle arm was twisted, the handle and handle pin being intact and attached, and the cleat on the drum lid was intact and in place but twisted counterclockwise with a fracture running longitudinally between the end of one of the horns to its center in way of the rivets or bolts securing it to the drum cover.

Mr. Handy's opinion was that a slackening force followed by a shock force brought about by a fortuitous combination of wind, water and movement of the vessel resulted in a minutia of backoff on the drum prior to a receding of and stoppage by the roller pawls which energized the handles in a ratcheting direction. Resilience of metals and inherent play in the moving machinery brought about this occurrence without any failure or disrepair of parts. In support of his opinion, he pointed out the operating experience of the winch before and after the accident, the complete absence of any fault or defective condition of the winch and its components, the slight twisting or torque on the drum cleat confirming a shock force, a monetary slippage of the sheet on the drum when it again locked. All of these factors were, in his opinion, compatible with a shock force being the causation factor in this occurrence.

Claimant's expert, Major Threlkeld, a marine and building contractor, who was familiar with the "coffee grinder type winch" but who had not inspected the pedestal winch on the "MERIDIAN" was of the opinion that the cause of the accident must have been due to a worn condition of the dogs on the roller pawls with insufficient spring tension to properly set them. This condition, coupled with the lever being placed in a ratcheting position, would permit the drum to turn counterclockwise thus energizing the handles.

It was further his opinion that this condition existed prior to the commencement of the voyage and could have been discovered upon a proper inspection of the winch and drum.

I accept the opinion and explanation of the Petitioners' expert Handy and reject the contrary opinion and explanation of Claimant's expert Threlkeld. Under the latter's theory the handles on the winch would have turned immediately when the operator ceased to exert enough force to overcome the pull of the sheet from the sail to the drum, and certainly so upon the release of the handles. Moreover, this would require the failure of all springs and roller pawls at the same time.

I find that the pedestal winch was, in capabilities, design and efficiency, the best available, safer and superior to smaller capstan winches.

Claimant also attempted to prove negligence because he claimed it was improper to cleat the line on the drum; that the pedestal winch should have had removable handles similar to those on a capstan winch; that the personnel on board were inadequate and inexperienced; and that the Petitioners failed to warn Claimant of the dangers inherent in such a winch. These will be taken up seriatim.

Cleating of the sheet to the drum cleat represented good design and practice for it eliminates the tailing of the sheet with attendant handling exposures in connection with minor trimming adjustments requiring a taking in of the sheet. It is superior to cleating the sheet to a deck or mooring cleat, which could well cause undesirable overriding turns on the drum.

With respect to removable handles as against fixed handles, this winch had to have the power and speed in handling essential to ocean racing. Fixed handles made the operation of the pedestal winch readily and speedily available, compatible with the use of such winches, and minimized the damages inherent in removable handles which are necessary on capstan winches in order to permit the taking of turns around the drums on such winches without having to work the sheet around the length of the crank or handle.

While all of the personnel aboard the "MERIDIAN" were amateurs, except one, and necessarily so to comply with ocean racing rules, they had had extensive ocean racing experience. Not only were they adequate in number and ability, but there was no attempt to show, nor could there be, that any deficiency either with respect to number or ability was causally connected with the Claimant's injuries.

The evidence does not establish fault on the part of the Petitioners, nor was there negligence on their part in failing to warn Claimant or give him instructions concerning the pedestal winch. Petitioners neither knew nor should have known of any existing condition which could have caused or contributed to the Claimant's injuries.

*Was the "MERIDIAN" Unseaworthy?*

Petitioners argue that since there are no cases decided by the Supreme Court dealing expressly with yachts and persons participating in sailing thereon for enjoyment or sport, it should be observed that the warranty of seaworthiness is not a warranty of absolute perfection, but one of reasonable seaworthiness for the purposes and uses intended.

Without reviewing all of the cases touching upon this point, from The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760, to the comparatively recent Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941, it will suffice to quote at length from Carpals v. The S. S. American Harvester, (2d Cir. 1961), 297 F.2d 9, petition for certiorari denied, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 84. In that case the libelant, while working as a ship mechanic for Todd Shipyards Corporation which had been employed by United States Lines Co., the shipowner, to prepare the ship's pipes and valves for inspection by the Coast Guard, pried a bonnet loose from a valve whereupon steam and hot water gushed forth burning him.

The trial judge in dismissing the libel held that it was an unexplained accident for which there could be no liability for negligence and added that since the checks showed an absence of pressure, the vessel was not unseaworthy.

The Court of Appeals for the Second Circuit, in reversing, said:

 We disagree and hold that under prevailing law the vessel must be held unseaworthy. Though the cause of the accident may be inexplicable, yet it, and the way it occurred, demonstrated that the valve was actually not in a safe condition for the work needed to be done upon it. The trial court believed that the independent tests made to double check the gauges and the fact that libelant saw no signs of pressure negated an unseaworthy condition. But we do not think that follows. The accident occurred; there was steam in the valve; and it erupted. These conceded physical facts imperatively required a finding of unfitness for the task in hand. Thus a conclusion of unseaworthiness should have been reached irrespective of the proofs tending to absolve the owner of negligence.

 Thus the situation falls within the 'absolute' duty of the shipowner to furnish a seaworthy ship which 'is essentially a species of liability without fault, analogous to other well known instances in our law.' Seas Shipping Co. v. Sieracki, 328 U.S. 85, 94, 66 S.Ct. 872, 90 L.Ed. 1099, quoted in Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 549, 80 S.Ct. 926, 932, 4 L.Ed.2d 941, which has now settled the law we must apply. The Mitchell case points out that since Sieracki the Court's decisions 'have undeviatingly reflected an understanding that the owner's duty to furnish a seaworthy ship is absolute and completely independent of his duty under the Jones Act to exercise reasonable care'; that it applies equally to a condition arising after the vessel leaves her home port as before, or to one which may be only temporary; that it applies to defective equipment temporarily brought on board by an independent contractor over which the owner had no control; and that the latter's actual or constructive knowledge is not essential to his liability. 'What has evolved is a complete divorcement of unseaworthiness liability from concepts of negligence. To hold otherwise now would be to erase more than just a page of history.' 362 U.S. 539, 549, 550, 80 S.Ct. 933, 4 L.Ed.2d 941.[2] See also Michalic v.

"2. The Court went on to say: 'What has been said is not to suggest that the owner is obligated to furnish an accident-free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service.' 362 U.S. 539, 550, 80 S.Ct. 933 [4 L.Ed.2d 941]. But as the Court is at pains to point out, this has reference merely to the standards set for the ship and its appliances, and not to the duty which remains absolute. Thus it is an absolute duty to furnish a reasonably fit ship—a duty not performed here.

Cleveland Tankers, Inc., 364 U.S. 325, 327, 81 S.Ct. 6, 5 L.Ed.2d 20, and our own decision in Sprague v. The Texas Co., 2 Cir., 250 F.2d 123.

"It thus appears clear to us that the shipowner cannot wipe out this 'absolute' duty by saying that he does not know what caused the particular accident or suggesting in effect that it was an act of God.

\* \* \*

"Under the circumstances here disclosed of substantial injury from a failure of the ship's machinery, which demonstrates that it was unfit for its intended use, the breach of duty is clear. \* \* \*"

 In the light of the foregoing, I find that the "MERIDIAN" was unseaworthy.

### Damages

Claimant sustained a fracture of the frontal area of his skull as well as a fracture of the superior aspect of the right orbit; right nasal bone area; right side of the maxillary floor of the right maxillary sinus; linear fracture also oc-

curred involving the zygomatic of the maxillary and frontal process of the zygoma.

Operations were performed on Claimant in Nassau, B.W.I., on the day of his injury involving his brain and right eye. Surgery was later performed in Miami on February 15, 1961 to reduce the facial fractures; to elevate the malar bones, and to wire Claimant's jaw. Another operation was performed on May 3, 1961, to repair the dural sinus and acrylic cranioplasty. On July 27, 1961, plastic surgery was done to revise facial scars.

Claimant was hospitalized from January 31, 1961 to March 18, 1961; from May 2, 1961 to May 11, 1961; and from July 2, 1961 to July 28, 1961. His hospital and medical expense amounted to $8,075.80.

He sustained a permanent partial neurological disability of thirty percent of the body as a whole, a loss of vision in his left eye amounting to seventeen percent of the body as a whole, and an additional five percent permanent partial disability of his right lower extremities resulting from a fascial graft removed from the thigh to cover the brain dura where it had been pierced.

Claimant has double vision when he reads or writes for any period of time. He also has headaches, dizzy spells, numbness on the right side of his face and a crooked right lip when he smiles. He has lost all sense of taste and smell.

Prior to the accident he was active in many recreational athletic pursuits which he has had to give up as a result of his injuries. He has undergone a change of personality and suffers from some loss of memory.

Claimant's life expectancy was thirty-nine years and one hundred and seventy-nine days. Because of his brain scarring he is subjected to the hazards in the future of some further disability and surgery. Periodical medical examinations will be required for eye testing and neurological deficit.

Claimant is mechanically inclined, having worked on automobiles operated in his father's limousine service. He was previously employed as an outboard motor and typewriter repairman. In the year 1960 he earned $4,705.55. In January 1961, he was operating his own taxi cab and working as a male model. One television commercial made by Claimant in 1960 returned $693.00. The residuals of this film were $1,426.63 in 1961 and $660.00 in 1962. Prior to the accident his modeling prospects were good. He is now unable to engage in this field.

He returned to work in March of 1962 and has, in addition to his taxi cab, been engaged in the air conditioning business.

Claimant's earnings as reflected in his income tax returns for the four years prior to the accident were as follows:

| 1957 | $1,795.39 |
| 1958 | 1,545.20 |
| 1959 | 3,711.87 |
| 1960 | 4,701.55 |

Unquestionably, the Claimant suffered grievous injuries. His recovery has been remarkable but he is nevertheless left with approximately fifty (50%) percent permanent disability of the body as a whole.

Claimant has incurred past medical and hospital expenses of $8,075.80. His future neurological and eye examinations, together with reasonably probable expenses attributable to his injuries, would appear to amount to $3,500.00.

He was unable to work from January 31, 1961 to September 1, 1962 and his lost wages for this period amount to $10,000.00.

Claimant's future loss of earning capacity, I calculate to be $54,000.00.

His damages for past and future pain and suffering and inability to lead a normal life are at best most difficult to determine. In my opinion, a reasonable sum in this respect is $50,000.00.

█ I therefore find the Claimant's damages to be in the sum of $125,575.80.

*Limitation of Liability*

From what has already been said, it is clear that Petitioners' claim for exoneration from liability cannot stand.

The thrust of Claimant's argument against limitation is the Petitioners' alleged negligent failure to inspect the pedestal winch and to warn Claimant. As to the former, Claimant relies on the line of cases that impose liability for the failure to make a proper or sufficient inspection, Austerberry v. United States (6th Cir. 1948), 169 F.2d 583; The Cleveco (6th Cir. 1946), 154 F.2d 605; In re Petition of Henry DuBois' Sons Co., (D.C., S.D.N.Y.1960), 189 F.Supp. 400, and upon this premise, asserts that "privity and knowledge" of a defect means not only actual knowledge but the failure of one seeking limitation to avail himself of knowledge. Avera v. Florida Towing Corp. (5th Cir. 1963), 322 F.2d 155; States Steamship Co. v. United States (9th Cir. 1957), 259 F.2d 466.

That these authorities support the propositions for which they are cited cannot be doubted, but they are inapposite here, for there was no negligence, no foreseeable consequences and no fault, or disrepair that an inspection prior to the accident would have disclosed. Precisely because of this situation, Petitioners likewise had no knowledge of any defective condition about which they could or should have warned the Claimant.

 The Petitioners' liability to the Claimant for failure to supply a seaworthy vessel, however, flows from an obligation imposed by law which is absolute, non-delegable, and not subject to disclaimer, but is subject to the Limitation Act, absent the Petitioners' privity and knowledge. The Susan (2d Cir. 1956), 230 F.2d 197, 1956 A.M.C. 547, Ct. In re East River Towing Co., 266 U.S. 355, 45 S.Ct. 114, 69 L.Ed. 324.

 Iteration of the facts evidencing complete lack of privity and knowledge of the Petitioners here is unnecessary. The mere fact that Petitioner READ was on board the "MERIDIAN" at the time of the accident is of no consequence. This is not incompatible with limitation of liability. As was said in Blackler v. F. Jacobus Transportation Co. (2d Cir. 1957), 243 F.2d 733:

" 'Privity and knowledge' is a term of art meaning complicity in the fault that caused the accident, and if the petitioner is free from fault his actual knowledge of the facts of the accident does not prevent limitation. The 84–H, 2 Cir., 296 F. 427, certiorari denied 264 U.S. 596, 44 S.Ct. 454, 68 L.Ed. 867; 3 Benedict on Admiralty § 489 (6th Ed. 1940)."

 I find that the injuries to the Claimant resulting from the malfunctioning of the pedestal winch did not occur through any fault, neglect or want of care of the Petitioners, or either of them, but as the result of causes which arose without their privity, knowledge or design. Coryell v. Phipps, (S.Ct. 1932), 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363. The Spare Time II, (D.C., E.D.N.Y. 1941), 36 F.Supp. 642.

It results, therefore, that the Petitioners have demonstrated their right to limit their liability for damages suffered by the Claimant.

The respective parties have stipulated that the value of the "MERIDIAN", her sails, engines, tackle, apparel, and equipment at the termination of the voyage in question did not exceed the sum of $43,000.00, there being no pending freight recovered or recoverable. Each Petitioner has filed herein an Ad Interim Stipulation in the amount of $21,500.00. The Claimant is entitled to recover the full amount of the limitation fund of Forty-Three Thousand and No/100 Dollars ($43,000.00) representing the Petitioners' interest in the "MERIDIAN", and upon payment of same, the Petitioners shall be discharged.

The parties are directed to settle and submit a decree in conformity with the foregoing.

This opinion will serve as the Court's Findings of Fact and Conclusions of Law under Admiralty Rule 46½.