Petition of **TUG MANAGEMENT COR-PORATION,** a Corporation, for Exoneration from, or Limitation of Liability, as Charterer of the **TUG D. T. SHERI-DAN.**

**SHERIDAN TOWING CO.,** Inc., as Owner of the **BARGE JAMES SHERIDAN**

v.

**STEAMSHIP HAROLD H. JACQUET,** Her Engines, Boilers, Machinery, Etc., and All Persons Having Any Interest Therein

and

**Lexington Transport Corporation.**

**Admiralty No. 421 of 1965.**

**Civ. A. No. 40755.**

United States District Court, E. D. Pennsylvania.

Aug. 5, 1971.

Harrison Kildare, Philadelphia, Pa. (with him on the brief, Rawle & Henderson, Philadelphia, Pa.), for Sheridan Towing Co., Inc.

James Young, Philadelphia, Pa. (with him on the brief, Krusen, Evans & Byrne, Philadelphia, Pa.), for Lexington Transport Corp.

Robert G. Kelly, Sr., Philadelphia, Pa. (with him on the brief, William R. Deasey and R. Thomas McLaughlin, Philadelphia, Pa.), for Tug Management Corp.

## FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW AND ORDER

JOHN W. LORD, Jr., Chief Judge.

This litigation arises out of the collision between the SS HAROLD H. JACQUET and the BARGE JAMES SHERIDAN, which was being towed by the TUG D. T. SHERIDAN, on the evening of December 15, 1965.

After a ten day trial to the Court without a jury, briefs and replies were submitted by counsel, and the Court makes the following:

## FINDINGS OF FACT

1. Petitioner, Tug Management Corporation, is a Pennsylvania corporation, having its principal place of business at 12 South Twelfth Street, Philadelphia, Pennsylvania.

1(a). Petitioner was the operator of the Tug, D. T. SHERIDAN (hereinafter Tug), under a bareboat charter from the registered owner, Sheridan Towing Co., Inc.

1(b). The Tug was a seagoing vessel of three hundred eighty-three gross tons, with a length of 129.9 feet, and a freeboard of twelve to fourteen feet forward and about two feet aft. The house of the Tug was about seven and one-half feet high, with the wheels and controls located therein. The Tug's motor was 1600 horsepower.

1(c). The Tug carried a Certificate of Inspection issued by the Coast Guard on July 10, 1964, which was in effect on the date of the collision.

2. Claimant, Lexington Transport Corporation, is a corporation with an office and place of business at 250 Park Avenue, New York, New York.

2(a). Claimant was the owner of the ship SS HAROLD H. JACQUET (hereinafter Jacquet), a ship of Liberian registry, manned by a Nationalist Chinese crew.

2(b). The Jacquet was an oil-fired steam turbine tank vessel, five hundred sixty feet in length overall, with a seventy-five foot beam, weighing 13,405 gross tons, with a maximum draft of 23 feet, 2 inches.

3. Claimant, Sheridan Towing Co., Inc., is a Pennsylvania corporation having its principal place of business at 12 South Twelfth Street, Philadelphia, Pennsylvania.

3(a). The seagoing Barge JAMES SHERIDAN (hereinafter Barge) was operated under a bareboat charter by Sheridan Transportation Company, which, like Tug Management Corporation, was a separate Sheridan affiliate.

3(b). The Barge was compartmented, without independent locomotive power, 349 feet 10 inches in length, with a beam of sixty-six feet and a depth of 31 feet 6 inches.

3(c). The Barge maintained a diesel generator for use in operating its winches.

3(d). The Barge carried a Certificate of Inspection issued by the Coast Guard in April of 1964, and an amended certificate issued on June 14, 1965, which was in effect at the time of the collision.

4. On December 15, 1965, American Dredging Company was in the process of deepening an area of the western side of the upper portion of the Chesapeake Bay between Brewerton Channel and Poole's Island Range, pursuant to a contract with the United States Corps of Engineers.

5. The Dredge PENNSYLVANIA (hereinafter Dredge) was 165 feet in length and 50 feet wide, with a lighted, extended dredging pipe, 700 to 750 feet in length, carrying, at 50 foot intervals, amber marking lights. The body of the Dredge was also lighted. At the point where the pipe submerged were two red lights, mounted one above the other.

6. The Tug was towing the Barge alongside on a hawser, with the port side of the Tug secured to the starboard side of the Barge, using a bowline, towing line, breastline and stern line to make her fast.

7. The Barge had discharged in Philadelphia 3000 to 4000 tons of her total cargo of 10,600 tons of phosphate rock, which had been loaded in Boca Grande, Florida.

8. The cargo was carried in compartments beneath the deck of the Barge, and the remainder was to be delivered to Baugh's Chemicals' dock in Baltimore, Maryland. The six hatches on the Barge rose only four feet eight inches above the deck.

9. The Tug was equipped with three navigational, foremast, twenty-point white lights, mounted on a mast thirty feet above the wheelhouse, which indicated the nature of the Tug's operation, i. e., one light burning indicated that the Tug was alone; two indicated a tow alongside or being pushed; and three burning lights indicated a tow astern or on a hawser.

9(a). The Tug was also equipped with two running lights, green on the starboard side, red on the port, which were mounted atop the wheelhouse, as was a searchlight.

9(b). The running lights were properly screened, so that they could not be seen across the bow.

9(c). There was a 12 point white light on the stern, i. e., a light showing only twelve points on the compass behind.

9(d). The Tug was equipped with a Coast Guard approved lighting switch box, which sounded a buzzer when a bulb burned out. There was also aboard a working air horn and radar.

10. The Barge carried red and green running lights forward, thirty feet from the bow, eight feet one inch above deck; and two white running lights aft, thirty-one feet from the stern, ten feet above the deck, four feet eight inches apart on a crossarm. The running lights were properly screened, and all lights were visible for five miles on a clear night.

10(a). The Barge also carried a portable white bow light, which was not displayed.

10(b). The running lights were mounted in a four-bulb lamp, with an automatic rotating device in the event that one burned out.

10(c). The lights were battery operated, and were equipped with a photoelectric cell which automatically turned them on at dusk and off at dawn.

10(b). Before leaving Philadelphia, the Barge captain, who met the Barge in each port but did not ride with the Tug, tested the lights and replaced each light with five new batteries. Each light was then working when the Barge and Tug left Philadelphia for Baltimore.

11. The Tug left Philadelphia at approximately two A.M. on the morning of December 15, 1965, proceeding down the Delaware River, through the Chesapeake and Delaware Canal, assisted by a second tug at that point, arriving in the Upper Chesapeake Bay above Poole's Island Channel at approximately 4 P.M. on the same day.

12. Throughout the passage, the Tug was made up to the starboard side of the Barge at an angle of 15–20 degrees, with the bow of the Tug above 100 feet forward of the stern of the Barge. This physical positioning was necessary for steering purposes.

13. In this position, Captain Patrick, master of the flotilla, could see the white stern lights of the Barge, slightly behind the wheelhouse of the Tug.

14. Although the flotilla was steering a course due south of 180 degrees, the angle of the bow of the Tug on the side of the Barge created a tendency on the part of the Barge to move away, so that its bow heading would become less than 180 degrees due south. When this occurred, it became necessary for the Tug to back and fill in order to regain its position and control of the Barge.

15. Captain Patrick was the only licensed pilot on the Tug. A licensed pilot is required for the waters of the Chesapeake and Delaware Canal, with the result that he was required to remain on duty from the time the Tug got underway in Philadelphia until the time of the collision, sixteen hours later.

16. Captain Patrick was not licensed for the waters below the Chesapeake and Delaware Canal.

16(a). About one year before the collision, he had taken and failed the examination for pilotage for the waters of the Upper Chesapeake, where the collision occurred. He had failed to answer correctly questions dealing with "local knowledge", which he said pertained to the waters around Baltimore Harbor, and which he had been told by the testing

officer would not be included in the test. He did pass the section dealing with navigation in the waters in which the collision occurred.

16(b). Local knowledge includes such matters as tides, winds, weather and current.

16(c). It is not the custom of the testing officer to exclude any matter from the examination. Each testee is given an *inclusive* list of topics, among which is local knowledge.

16(d). Captain Patrick failed this portion of the examination due to a lack of knowledge of local conditions, a lack which contributed materially to the collision.

16(e). Due to a later change in the statute, Captain Patrick was able to qualify, on the basis of past experience and pilotage, as a pilot for these waters without further examination.

17. The flotilla had been making an average speed of six knots until, about two miles above the Dredge, it slowed its speed to half-ahead, or about three knots.

18. Further down, the Tug signaled the Dredge for a passing agreement but received no reply.

19. The Tug cut its engines at a point approximately 200 feet above the Dredge, and drifted almost dead in the water, on the fair ebb tide current of about one-half knot, keeping the flotilla on a southerly course of about 180 degrees by touching the engines slightly ahead or astern.

20. Coming north from Baltimore, the Jacquet was headed for Buoy No. 12, which marked the northeast entrance to Poole's Island Channel, in water 26 feet deep.

21. The Jacquet was piloted by a fully licensed Bay pilot, Presley A. Carter, and was making approximately fifteen knots, full ahead, as it proceeded up the Chesapeake Bay.

22. Speed was reduced from full to half-ahead at approximately 1802 hours, off Tolchester Light, in order to prepare to pass another flotilla. At 1807, the Jacquet reduced to slow-ahead, and the other flotilla was passed.

23. Captain Carter was not using the radar of the Jacquet for navigational purposes, but it had been used prior to passing this other flotilla in order to ascertain the position of the Dredge and the Sheridan Tug and Barge.

24. Both visually and on radar, Captain Carter saw, north and west of the Dredge, the Tug Sheridan and its tow. Approaching the Dredge, Captain Carter saw, on the Tug, the green side light, the house lights, and three towing lights, indicating a tow on a hawser. Captain Chen, master of the Jacquet, saw only two white lights in line, and the green running light, and Captain Stillwagon, a coast pilot who docked the Jacquet also saw only the two and one set of lights, indicating to both men a tug with a barge alongside. Captain Carter, whose testimony was available to the Court only through deposition, stated that he might have been mistaken as to the number of lights, but that if he were, there were two visible white lights.

25. The bridge on which the three men were standing is 24 feet above deck level, so that objects directly in front of the ship must be seen from the wings of the ship. The bridge is 425 feet aft of the bow of the ship.

26. After passing Buoy No. 9, the Jacquet changed its course to port in order to approach through the dredging area. The channel in the dredging area was 200 feet wide, plus approximately seventy-five feet to the body of the Dredge. On the westward side of the channel was the Dredge and much of its equipment, while on the eastward side were two white lighted steady buoys, put out by the Dredge to show the limits of its dredging operation. The entire dredging operation was visible to Captain Carter on the Jacquet.

27. The change of course of the Jacquet was effected by directing the ship to the entrance of this marked channel, to the east of the center line, moving the

ship from 14 degrees to 353 degrees, a sudden shift of 21 degrees.

28. Captain Carter blew one long blast to the Dredge, which replied with one short blast. The Jacquet acknowledged with a short blast, which Carter understood to mean that the Dredge was in position and had given the ship permission to effect a port-to-port passing.

29. A vessel swinging hard to port in such a channel is guilty of serious fault if a collision occurs absent a serious reason for the course alteration. There was no reason for this sudden shift by the Jacquet. The channel cut through which it could have passed *outside* the buoys was at all points at least 90 feet wide, with sufficient depth for the Jacquet to navigate.

30. The draft of the Jacquet never exceeded 23 feet, six inches. The five fathom (thirty foot) depth which extended through the collision area, outside the buoys, was more than sufficient for the Jacquet's passage.

Following the depth in one hundred foot grids from a point two ship lengths below the area of collision, to a similar point above it, there were: 90 feet of six fathom water, one hundred feet, a second area of one hundred feet, 200 feet, 220 feet, 250 feet, 275 feet, 280 feet and 305 feet, expanding beyond the Dredge to 330 feet before regressing, although, even going beyond the area of collision for another two ship lengths, the width of the area never was less than 215 feet.

31. The original course of the Jacquet would have brought it outside the buoys. Captain Carter stated that he passed inside the buoys because they marked the channel of the dredging area, and were put out by the Dredge to establish the limits of its operation. However, they were not navigational buoys. His statements that to proceed outside the buoys would have been unsafe is contradicted by the charts and depth recorder available to him. While the original grid of 90 feet did not leave a great deal of room to maneuver a

75 foot wide ship, he should have been aware, from his charts, that the channel expanded into a more than safe area of navigation.

32. By his own admission, Captain Carter knew that the water east of the buoys could have been as much as ten feet more than was required by his vessel.

33. That this would have been a sufficient distance in which to swing hard to port after passing the Tug and tow (if it had become necessary) is amply evidenced by the fact that the Jacquet had made such a turn in that distance immediately before the collision.

34. At 1810, Captain Carter had increased the speed of the Jacquet to half-ahead, or seven knots, in order to have better control of his vessel while it passed through the dredging area.

35. We find that the speed of the Jacquet was excessive. There were different estimates by the three captains on the bridge of the speed of the Jacquet at half-ahead. Using the lowest estimate as most favorable to the Jacquet, that of Captain Carter that it was seven knots while 75 feet from the Dredge, this was clearly in excess of the statutory limit of five miles per hour when passing inside a dredging operation, up to 200 feet from a Dredge.

36. The Jacquet also committed statutory fault by failing to post a lookout in the bow of the ship. Captain Carter stated that despite rain and mist, visibility was excellent, so good in fact that he did not turn on the bridge's window wipers. However, Captain Chen testified that he could not see over the bow of the ship, and that often a lookout would have to leave the bridge and go onto the wings for a better view. Despite this, no lookout was posted. Captain Carter did not see the Barge's white lights and did not see its port running light until after the collision. It would appear, then, that a lookout four hundred and twenty-five feet forward could not have helped but give the vessel an added margin of safety.

37. Captain Carter had seen the Tug both visually and on radar, and had seen displayed lights indicating a tow; he admitted a tug holding dead in the water with a tow on a hawser would be brought downstream by the ebb tide (but that it could not have come down into the cut without a turn by the tug), yet he did not attempt to learn the exact position of the flotilla, and moved his ship inside the buoys knowing that the flotilla might move into his path.

38. Lying above the dredging operation, Captain Patrick maintained control of the tow by putting his engines ahead and astern, and, in so doing, approached the Dredge. Because of the difficulty of controlling the tow and maintaining it on a proper heading, he assumed control of the helm.

39. Captain Patrick heard the exchange of signals between the Jacquet and the Dredge and realized that they meant that the Jacquet had been given permission to pass to the east of the Dredge.

39(a). Captain Patrick saw the Jacquet change her course to port.

39(b). Captain Patrick blew a danger signal, aroused the crew, and began to back the Tug's engines to get the Barge out of the way of the oncoming Jacquet. However, before this could be done, the bow of the Jacquet came into collision with the starboard side of the Barge just forward of the Tug's bow, at a point approximately 300 feet north of the Dredge's pipeline, where the channel was 400 feet wide.

39(c). The collision caused the towing lines to part, with the Barge moving down the Jacquet's starboard side and the Tug its port.

39(d). The two ships exchanged radio information regarding assistance and injuries.

40. The Jacquet then proceeded upriver, and the Tug made fast to the Barge and continued on to Baltimore.

41. We find that the Barge lights were operating prior to the collision: they had been checked and the batteries replaced in Philadelphia. Captain Patrick had sent tug hands aboard the Barge at nightfall to check on the lights, and they reported them working. A second check, after the collision, resulted in an identical report.

41(a). Although Captain Carter stated that he never saw the stern lights of the Barge, and its red running light only after the collision, the Jacquet's docking pilot (Stillwagon) saw both, as did the operator of the Dredge.

41(b). The Tug was "toed-in" at an angle of 15–20 degrees, so that its wheelhouse would not have obstructed Carter's view of the stern lights of the Barge.

42. The failure of the Barge to display a white light at its bow was not a cause of the collision.

42(a). Even if the Barge had been required to display such a light, and we find that it was not (see Discussion, part III, infra), we do not see how it could have been a cause of the collision. Captain Carter stated that he knew the Tug had a tow on a hawser (and while he might have been mistaken as to the number of lights burning, he knew that there was a tow). Since the tow was not visible to him, it had to be on the port side of the Tug; since he saw the Tug laying dead, he knew that the tide could move forward; yet, despite all of these evidences of a tow that could enter his path, he took no action except to illegally pass inside the Dredge's buoys at an illegal rate of speed without a lookout.

42(b). Captain Carter did see the deckhouse and running lights of the Tug and the towing lights indicating the presence of a tow. We fail to see how another light could have aided his blatantly illegal navigation of his vessel.

42(c). He also stated that the Barge *should have had red and green running lights and two white lights aft,* all of which others saw. The lights he required and expected to be displayed *were* displayed, seen or unseen by the Captain.

42(d). Captain Carter's command of the Jacquet was negligent and in violation of statute.

43. Captain Patrick's command of the Tug and Barge was similarly improper.

43(a). The course alleged by the Captain of the flotilla was due south with the Tug facing slightly east of south because it was cocked into the tow.

43(b). If the tow had been due south as alleged, the collision with a northern bound vessel could not have occurred even with the Jacquet's swing west of the buoy line.

43(c). Captain Patrick had failed the examination dealing with local tides, which ran, in this area, in a south-westerly direction of approximately 225 degrees. Such a tide would have moved the tow west into the path of the Jacquet.

44. Because he was unfamiliar with the tides in the area of the collision, Captain Patrick's drifting was negligent in that he assumed that he could maintain a steady position above the Dredge, while, in fact, the current moved him into a position of danger.

45. Although we discount the allegations of a voice stating that the tow "got out of shape", we are persuaded by the preponderance of the evidence that the drifting of the Barge into the path of the Jacquet was due to Captain Patrick's failure to properly navigate in the waters above the Dredge; and that this failure caused him to permit the tow to drift out of line with the Tug to such an extent that it was carried into the path of the Jacquet.

46. Captain Patrick had been continuously on duty from the time the flotilla got under way in Philadelphia at 2 o'clock A.M. until the time of the collision, shortly after 6 o'clock P.M., more that unbroken period of duty was excessive, and fatigued the Captain to such a degree that it contributed to the accident.

47. Captain Patrick described to the Court the maneuvers necessary to prevent the Barge from slipping from the control of the Tug. Attempting to perform these controlling maneuvers in unfamiliar currents with a tide carrying him rapidly into the path of the Jacquet, under the stress of an excessively long day, Captain Patrick was unable to sufficiently control the tow, and drifted into the collision.

48. The collision is attributable to the fault of both captains.

## DISCUSSION

Petitioner, Tug Management Corporation, the bareboat charterer of the Tug, filed a petition for exoneration from or limitation of liability. The Tug was not damaged in the collision. Both Sheridan Towing Co., Inc., owner of the Barge, and Lexington Transportation Company, owner of the Jacquet, both craft having been severely damaged, filed their claims in the limitation proceedings and cross-claimed against one another, with Tug Management Corporation cross-claiming against the Jacquet for any damages which might be awarded against it.

Sheridan Towing Co., Inc. then joined American Dredging Company, owner and operator of the Dredge Pennsylvania, as an additional defendant. The Court enjoined an earlier action instituted by the owner of the Barge against the owners of the Jacquet in personam, and the Jacquet in rem. Both actions were consolidated for trial, at the conclusion of which the motion of American Dredging Company to dismiss the complaint and cross-complaints against it was granted.

The Court feels compelled to discuss several areas of law with regard to the collision and its aftermath. They are the Tug captain's lack of pilotage and fatigued condition while on duty, and the Tug's alleged lack of sufficient power as a tow; the course and speed of the Jacquet and its lack of a lookout; the lighting of the Barge; the piercing of the corporate veil of the Sheridan companies; and the limitation of liability itself. We find that the captain's lack of pilotage and exhaustion, but not the Tug's motive power, contributed to the

accident; that the Jacquet's course and speed were statutory faults, as was its lack of a lookout; that the Barge was properly lighted; that the companies are valid separate corporate entities; and that the petition for limitation of liability will be denied.

## I

Captain Patrick was unfamiliar with the currents in which he permitted his flotilla to drift, a drifting which eventually carried him into the path of the illegally moving Jacquet.

When a vessel in charge of an officer who has not the pilotage required by law is in a collision, the question arises as to whether that fact constitutes a statutory fault within the rule of The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1873), which holds that the burden is on the vessel violating a statute to show that the violation *not only did not, but could not have*, contributed to the collision.

■ While some circuits have considered the lack of a license to be statutory fault, *see, e. g.*, The Eagle Wing, 135 F. 826 (D.C.1905), it seems clear that the absence of a license does not impose liability per se when the unlicensed officer performs his duties properly, *see e. g.*, The San Juan, 1927 A.M.C. 384, although it is a factor to be considered in determining questions of negligence.

■ We find fault on the part of the Tug's master, but not fault per se as advanced by Claimant Lexington, citing The Walter D. Noyes, 275 F. 690 (E.D. Va.1921). Rather, as stated in The Wrestler, 144 F. 334 (2nd Cir. 1906), "[t]he mere fact that her pilot was an unlicensed man should not be enough to condemn [the ship]. Although a violation of statutory requirement, it would not be a contributing fault if the navigation of the unlicensed man were correct. The presumption of inexperience and unskillfulness, arising from his holding no license would in such event be rebutted by proof that on the occasion in question he navigated expertly and skillfully." *Id.* at 337.

Captain Patrick was not an inexperienced pilot. He had towed over the route in question for some time prior to the collision. However, his navigation did not hold him above the Dredge on the north-south holding which he claimed. It could not have. It carried him west and into the path of the illegally advancing Jacquet.

Griffin on Collisions (1949) refers to the lack of a master's certification as a condition, rather than a cause of a collision. Section 254 at 579. Here, Captain Patrick had failed the portion of the examination for this area which dealt with local knowledge. While the Court permitted him to explain at length his reasons for failing,[1] the fact remains that he did not know the currents of the area, as evidenced by the fact that his

---

1. Captain Patrick testified that "local knowledge", the portion of the examination that he failed, dealt only with docking conditions in Baltimore Harbor, depths by piers, etc., and that the only reason for his failure was the assurance of the testing officer that it would not be covered, and, therefore, need not be studied for at that time.

46 C.F.R. part 10.05–43 states:
(a) An applicant for an original license as pilot or initial endorsement of master's or mate's license as pilot shall be required to pass a satisfactory examination as to his knowledge of the subjects listed in this paragraph:

\*　　\*　　\*　　\*　　\*

(3) Local knowledge of winds, weather, tides, current, etc.

A copy of this regulation is given to each testee in the form of CG 191, Rules and Regulations for Licensing and Certificating of Merchant Marine Personnel —Subchapter B. Although this was issued by the Coast Guard in May, 1968, a predecessor publication, containing the same information, was issued to each testee at the time when Captain Patrick took the examination, and contained the same language. *No portion of the examination is in any way marked as separate, or liable to be administered at a later date.*

tow did drift into the path of the Jacquet.[2]

Counsel for petitioner has informed us that Captain Patrick possessed a master's license at the time of the collision which would have subsequently qualified him as a pilot in the area of collision without the need of an examination due to a later change in the statute; and that he did obtain a pilotage license for these waters subsequent to the collision without a second examination. However, the statute has not been cited as retroactive and, at the risk of overstating the proposition, the fact remains that he had failed the examination on local knowledge, and that this lack of knowledge of tides and currents contributed to the collision.

In The Henry O. Barrett, 161 F. 481 (3rd Cir.); certiorari denied sub nom. James McCaulley v. American Dredging Co., 212 U.S. 573, 29 S.Ct. 683, 53 L.Ed. 656 (1908), it was held that the failure of an officer in charge of navigation to hold a required license is statutory fault. Following this reasoning, it is incumbent upon the vessel to show that this fault neither did not nor could have contributed to the collision. This it clearly has not done.

The Lexington Company has also introduced, in an almost casual manner, the inference that because additional assistance was provided the Tug to tow the Barge through the C and D Canal, that the Tug itself was insufficiently powered. There is nothing in the record to indicate this. The Tug had towed the Barge from Boca Grande, Florida to Philadelphia; was met by another tug only for the journey through the C and D Canal where such assistance is customary, and, after the collision, continued unassisted to Baltimore.

Claimant Lexington asserts that the eerily disembodied voice saying, "it got out of shape", substantiates the claim of insufficient power. See note 2, supra. We find more persuasive the concept that Captain Patrick drifted in unfamiliar currents while in a fatigued condition, a combination of conditions which contributed to his flotilla getting out of shape (a descriptive phrase for what happened, whether or not it was uttered).

We find that a sixteen hour day would fatigue any man, when he was called upon to serve as the only licensed officer of the flotilla. We conclude that the obligation of serving as pilot, master and frequently lookout would induce a state of weariness in the Captain. When coupled with a drifting pattern in waters with whose currents he was unfamiliar, we conclude that this was a substantial factor in the Barge getting in the way of the Jacquet.

Although we discuss the liabilities of the Barge and Tug to one another, infra, it appears best to dispose here of the issue, raised by the Jacquet, of Sheridan Towing's liability for failing to properly man or equip [3] the towing vessel.

While the claim for negligent failure to supply an adequate crew under the Jones Act is not synonymous with a claim of unseaworthiness, even though each may overlap the other, Michalic v. Cleveland Tankers, 364 U.S. 325, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960), we assume that counsel for the Jacquet are asserting either one or the other or both, although their specific allegation is not spelled out. In Avera v. Florida Towing Corporation, 322 F.2d 155 (5th Cir. 1963), the authority cited by Claimant Lexington, an inexperienced minor lost a limb when assigned to do work which everyone, including the owner and the ship's master,

2. The Jacquet introduced the testimony of Captain Stillwagon, who stated that he heard Captain Patrick say, over the radio, following the collision, "The barge got out of shape and I couldn't bring her back." We have not considered this testimony, dealing as it does with a disembodied voice *never before heard by the witness*, making statements advantageous to the witness' employer. See Wigmore on Evidence, § 660; § 1361 et seq.

3. We deal with the question of responsibility for properly lighting the Barge, infra.

admitted he was unable to do. The court in *Avera* refused to permit limitation of liability, although the boy had been hired without the owner's consent, to do work necessitated by a side trip which the owner had forbidden the master to undertake. Unlike corporate entities involved here, however, in *Avera* the owner was "* * * the whole show. * * * He was the president, treasurer, one of its three directors and the sole person who could utter a single authoritative word on its behalf. Others normally holding corporate executive offices or serving as directors frankly acknowledged their complete corporate impotence." *Id.* at 160–161. While we discuss the corporate questions, infra, we fail to see the applicability of the *Avera* facts to the instant case.

## II

■ The course and speed of the Jacquet were in violation of applicable statutes, and contributed materially to the collision, as did its lack of a lookout.

As we found above, the Jacquet changed its course to port to pass inside the dredging area, the entire operation of which was visible to Captain Carter on the bridge of the Jacquet.[4]

■ A vessel altering its course to port is guilty of serious fault if a collision should result, absent serious reason for doing so. This alteration of 21 degrees to port violated both 33 C.F.R. § 80.10, the Narrow Channel Rule, and 33 C.F.R. § 80.28. The first regulation provides that,

"In narrow channels every steam vessel shall, when it is safe and practicable, keep to the side of the fairway or mid-channel which lies on the starboard side of such vessel."

In The Hokendauqua, 270 F. 270 (D.C. N.Y.1919), affd. 270 F. 273 (2nd Cir. 1920), the court said that it was not "the mere physical dimensions of a strait or passage of water that determines whether it shall be called a narrow channel or not. It is the kind or character of navigating use to which that water is put." *Id.* at 271.

While dredging operations were taking place in the area, it is not necessary that this be so for the rule to apply. "Indeed, the authorities are to the effect that [the rule] may be applied in [waters] where the area is confined and water traffic passes in substantially opposite directions." Harbor Towing Corp. v. Tug Reliance, 211 F.Supp. 896, 899 (E.D.Va. 1963). And, as is stated in Griffin on Collisions, *supra*, "The rule shall apply * * * to places where there is a definite lane of navigation or current of traffic moving in substantially opposite directions, up and down confined waters limited by banks, *buoys*, anchorage grounds, etc." Id. at § 6, p. 91. (Emphasis supplied).

Here the channel conforms to the requirements of the rule as to width, *see*, *e. g.*, The Albert Dumois, 177 U.S. 240, 20 S.Ct. 595, 44 L.Ed. 751 (1900); operations taking place within the area; the type of traffic plying these waters; and the conditions under which it did so.

The Jacquet swung hard to port [5] without justification. We have above found that there was sufficient water to the starboard side of the channel for the Jacquet to have maintained its original heading.

---

4. Counsel for the Jacquet have advanced the theory that because Captain Carter could see the flotilla above the Dredge, he might have thought it part of the dredging operation. We cannot understand why an experienced river pilot would think a tug displaying towing lights would be an adjunct of a dredge, unless of course the tug was towing a dredge on a barge.

5. The Jacquet attempted to explain away this swing through the testimony of its expert witness, Captain Suarez, who related movement on the course recorder to the impact of the collision. The Court is not required to accept the evidence of a course recorder tape over the evidence of other witnesses which it finds convincing. Ira S. Bushey & Sons v. Standard Oil Co., 197 F.2d 788 (2nd Cir. 1952).

■■ Violation of the narrow channel rule is a statutory fault to which the rule of The Pennsylvania, supra, applies, and it is, therefore, incumbent upon the Jacquet to show that the violation neither could have nor did contribute to the collision. This it has failed to do, because while there is under *the Rule* a presumption that it is safe and practicable to keep to starboard, with the burden on the violator to prove otherwise, *see, e. g.,* Moore-McCormack Lines, Inc. v. S. S. Portmar, 249 F.Supp. 464 (S.D.N.Y. 1966); Red Star Towing and Transportation Co. v. Tug Catherine, 305 F.Supp. 639 (S.D.N.Y.1969), here there is more than a presumption: there is ample evidence that sufficient five-fathom water lay to the starboard of the Jacquet, as well as Captain Carter's admission that the water might have run as much as ten feet more than what was required by the vessel, and that he had available both recent charts and a depth-recorder, neither of which he used. Finally, while counsel for the Jacquet have correctly cited *Griffin, supra,* for the proposition that the rule is waived where there is excuse, they have neither proved, nor have we found the existence of, any such excuse.

The Jacquet also committed statutory fault by passing between the Dredge and her buoys. 33 C.F.R. § 80.28 provides:

> Vessels whose draft permits shall keep outside the buoys marking the end of mooring line of floating plant working in channels.

Without further discussion of the available safe water outside the buoys we note that the Jacquet has not only failed to meet the burden of the rule of The Pennsylvania, *supra,* it has also failed to indicate how passage inside the buoys was in any way necessary. Captain Carter himself stated that if the Dredge had not been there *he would have steered to east of where the buoys were.* His assertion that the buoys marked the limit of safe water is completely contradicted by the fact that *dredge buoys are not navigational,* but rather mark the limit of dredging operations. We do not feel it necessary to discuss once again the charts and recorder available to the captain.

The speed with which the Jacquet passed the Dredge was in violation of 33 C.F.R. § 80.27, which provides:

> Vessels, with or without tows, passing floating plant working in channels, shall reduce their speed sufficiently to insure the safety of both the plant and themselves, and when passing within two hundred feet of the plant their speed shall not exceed five miles per hour. While passing over lines of the plant, propelling machinery shall be stopped.[6]

Captain Carter testified that he passed off the Dredge by about seventy-five feet, at approximately half-ahead, or seven knots.[7] Excessive speed has consistently been held to be a statutory fault within the rule of The Pennsylvania, *supra.* A. H. Bull S. S. Co. v. Chesapeake S. S. Co. of Baltimore City, 101 F.2d 599 (4th Cir. 1939); A/S Skaugaas (I. M. Skaugen) v. The T/T P. W. Thirtle, 227 F.Supp. 281 (D.Md. 1964); affd. Dredge Cartegena v. The T/T P. W. Thirtle, 345 F.2d 275 (4th Cir.); certiorari denied 382 U.S. 918, 86 S.Ct. 292, 15 L.Ed.2d 233 (1965).

The Jacquet has argued that the court in American Export Lines, Inc. v.

---

6. Although counsel for the Tug have advanced as fault the fact that the Jacquet's propelling machinery could have fouled the lines of the Dredge and dragged the *Pennsylvania* into a collision, we have disregarded this violation of statute (not stopping propellers going over lines), because we base the Jacquet's liability only on the wrongs it did commit, not the harm that it could have done.

7. Captain Chen, master of the Jacquet, estimated half-ahead (the speed past the Dredge) to be 8 to 9 knots through the water. Captain Stillwagon estimated it at 5 to 7 knots, but this was based only on docking and undocking, when half-ahead would have been excessive and never used.

Dredge Admiral, 254 F.Supp. 1 (S.D. N.Y.1966), observed that *perhaps* the Secretary of the Treasury (and therefore the Commandant of the Coast Guard)[8] had no authority to promulgate the regulation in question. However, what the court said, after a truly exhaustive study of the statute's history, *Id.* at n. 8, pp. 6–8, was that *such an argument might have been made in 1938.*

In any event, a regulation is ordinarily presumed valid and a party seeking to attack it has the burden of persuading the Court of its invalidity. New York Foreign Freight Forwarders and Brokers Assn., Inc. v. Federal Maritime Commission, 337 F.2d 289 (2nd Cir. 1964), certiorari denied, 380 U.S. 910, 85 S.Ct. 893, 13 L.Ed.2d 797 (1965); and United States v. Obermeier, 186 F.2d 243 (2nd Cir. 1950), certiorari denied, 340 U.S. 951, 71 S.Ct. 569, 95 L.Ed. 685 (1951).

Finally, the Jacquet failed to maintain a proper lookout. 33 U.S.C.A. § 221 provides in part that:

> Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect \* \* \* to keep a proper lookout. \* \* \*

While there is no statutorily prescribed location for a lookout, it has been generally held that he should be on the bow of the vessel. Rice v. United States, 168 F.2d 219 (2nd Cir. 1948); Norscot Shipping Company, Ltd. v. Steamship President Harrison, 308 F.Supp. 1100 (E.D.Pa.1970); Sun Oil Company v. S. S. Georgel, 245 F.Supp. 537 (S.D.N.Y.1965), affd. 369 F.2d 406 (2nd Cir. 1966). Griffin on Collisions, *supra,* notes that "[o]rdinarily, the lookout should be in the eyes of the ship —as far forward as possible—where he can both see and hear to the best advantage." *Id.* at § 107, p. 271.

The *Rice* and *Norscot* courts, *supra,* have held the failure to so position a lookout to be statutory fault, as has the recent case of Petition of Harbor Towing Corporation, 310 F.Supp. 775 (D.Md. 1970). We agree with this reasoning. While Captain Carter testified that the rain and mist were light, the ship's master, Captain Chen, testified that lookouts, because of the bridge's construction, usually went out onto the wing to observe. Further, the more than four hundred feet advantage which a lookout would have given the ship might have allowed it some time for evasive action upon sighting the flotilla.

The Jacquet has argued that Albatross Tanker Corporation v. S. S. Amoco Delaware, 415 F.2d 692 (2nd Cir. 1969), holds that the absence of a lookout is not fault where the vessels have seen one another. This is not correct. In *Albatross* the court upheld the district court's finding that "all the information that could have been reported by a lookout had been seen and heard on [the ship's] bridge in ample time." *Id.* at 694. In the instant case, the ship's master himself testified that the bridge was not the best place for a lookout. In addition, Captain Carter described himself on the bridge as a very busy man: a lookout could have aided the captain in his tasks.

Neither Skibs Aktieselskapet Orenor v. The Audrey, 181 F.Supp. 697 (E.D.Va. 1960), nor Oliver J. Olson & Co. v. The Marine Leopard, 152 F.Supp. 197 (N.D. Cal.1957), both cited by the Jacquet, are applicable. In the first the court excused the lookout's *going below because* of the excellent weather conditions and the fact that both navigators had one another continuously in sight; in the second a lookout on the bridge had an *unrestricted* view from first sighting to collision.

"It is true that the statute fails to prescribe any specific place on a

---

8. The Coast Guard is now under the administration of the Secretary and Department of Transportation. See Pub.L. 89–670, Oct. 15, 1966, 80 Stat. 931; 14 U.S.C.A. § 1 (1971 Cumulative Annual Pocket Part); and 49 U.S.C.A. § 1655 (b) (1).

vessel for the lookout to be stationed, but the courts have held that good navigation makes it necessary that the lookout shall be stationed in the forward part of the vessel and at a point best suited for hearing and observing the approach of vessels and where his vision will be freed from all obstructions." The Buenos Aires, 5 F.2d 425, 432 (2nd Cir. 1924).[9]

### III

■ The Court will now attempt to shed some illumination on the question of whether or not the Barge was properly lighted.

33 C.F.R. § 80.16(e) provides that: "Barges, canal boats or scows towing alongside a steam vessel shall, if the deck, deck houses, or cargo of the barge, canal boat or scow be so high above water as to obscure the side lights of the towing steamer when being towed on the starboard side of the steamer, carry a green light upon the starboard side; and when towed on the port side of the steamer, a red light on the port side of the barge, canal boat, or scow; and if there is more than one barge, canal boat or scow abreast, the colored lights shall be displayed from the outer side of the outside barges, canal boats or scows." [10]

The Barge was so lighted, even though it did not obstruct the towing vessel. Both Carter and Stillwagon saw the red port light after the collision, and Stillwagon saw the white lights on the stern as well.

Although it deals with towing astern and the Barge was alongside, 33 C.F.R. § 80.16(b) requires red and green running lights forward and a white light astern:

[e]xcept that the last vessel of such tow shall carry two lights on her stern, athwartship, horizontal to each other, not less than 5 feet apart,[11] and not less than 4 feet above the deck house, and so placed as to show all around the horizon. A tow of one such vessel shall be lighted as the last vessel of a tow.

The Barge was so lighted.

The Barge was properly lit for towing on the high seas. 33 C.F.R. 80.16b of the Inland Rules provides that:

"Nothing in §§ 80.16, 80.16a, or 80.17 shall be construed as compelling barges, canal boats, scows, or other vessels of nondescript type not otherwise provided for, being towed by steam vessels, when passing through any waters coming within the scope of any regulations *where lights for such boats are different from those of the waters whereon such boats are usually employed,* to change their lights from those required on the waters on which their trip begins or terminates; but should such boats engage in local employment on waters requiring different lights from those where they are customarily employed, they shall

---

9. The absence of a lookout having no other duties is not a basis for a finding of fault if the bridge actually observes what a lookout should have seen. Osaka Shosen Kaisha, Ltd. v. Angelos, Leitch & Co., Ltd., 301 F.2d 59 (4th Cir. 1962). It is for this reason that the Tug's not posting a lookout was not a contributing fault. Captain Patrick and Seaman Steiner were on duty in the wheelhouse; when one had the wheel, the other maintained the watch. A third man would have contributed nothing. It would have been highly unsafe to place a lookout on the Barge, which was designed to run unmanned at all times.

10. There was considerable conflict as to whether the Barge was a barge, scow, or nondescript vessel. The all-encompassing language of the several Federal Regulations dealing with lighting makes the distinction immaterial, although we find the damaged vessel to have been a barge.

11. The stern lights were 4'10" apart, rather than the five feet required by law; but the lights would extend the additional two inches. In any event, the difference would not be apparent to oncoming vessels and, therefore, not a factor in the collision.

comply with the local rules where employed." (Emphasis supplied).

 The James Sheridan was a seagoing barge, so certified by the Coast Guard, temporarily inland to complete an oceangoing voyage from Boca Grande, Florida to Baltimore. Even if the Barge had been improperly lighted for inland passage, and we find that she was not, she was not required to change her correct international lights for the temporary inland employment.[12]

 New batteries were installed in Philadelphia, the lights were checked during the passage, they turned on automatically at dusk and rotated when one burned out; they were seen even on the Jacquet after the collision; and the impact would not have turned them on.[13] Positive evidence that the lights were burning is entitled to greater weight than the negative testimony of those who say that the lights were not burning or at least not seen. The Mamei, 152 F.2d 924 (3rd Cir. 1945), certiorari denied, sub nom. Eastern Transport Co. v. Walling, 328 U.S. 836, 66 S.Ct. 981, 90 L.Ed. 1611 (1946); The Buenos Aires, 5 F.2d 425 (2nd Cir. 1924). Lights shown to have been burning are given the benefit of the presumption that they continued to burn to the time of the collision. The Sun Oil Company v. S. S.

Georgel, *supra*. Even viewed as a weighing of two conflicting versions, without the benefit of presumptions, as the Jacquet urges, the evidence clearly shows that the lights were working up to, during, and after the collision.

## IV

 It remains for us to determine whether the Barge may be held accountable for the faults of the Tug, either because the two entities are so closely related to the parent corporation, or because under admiralty law greater care should have been taken by the Barge in its choice of tows.

The corporate integrity of these two companies was upheld in Petition of Dennis T. Sheridan, 226 F.Supp. 136 (S.D.N.Y.1964), where many of the same corporations were involved. The tug there was owned by a counterpart of Sheridan Towing, bareboat chartered to the petitioner herein; and the barge involved was bareboat chartered to the charterer of the Barge in this case.

The court there cited with approval United States v. Milwaukee Refrigerator Transit Co., 142 F. 247, 255 (C.C. 1905), which held that "[A] corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears; but, when the

---

12. Counsel for the Barge requested clarification of the question of proper lighting from the Office of the Commandant of the Coast Guard. Although objecting at the time of trial to the introduction of the Coast Guard letter, counsel for the Jacquet now insists that the reply binds the Barge, and counsel for the Barge insists that it does not. Pertinent portions of the letter read as follows:

"If, in the specific case you mentioned, the JAMES SHERIDAN obscured the sidelight of the tug, then she (the JAMES SHERIDAN) would be required to show only that sidelight she obscured (in accordance with 33 CFR 80.16(e).

"If, on the other hand, she did not obscure the tug's sidelight, then she is not otherwise provided for in 33 CFR 80.16, for subsection 33 CFR 80.16 (h) applies. In such a case, she

(again the JAMES SHERIDAN) must carry a white light at each end.

"For the purposes of vessels towed alongside, it is of little importance whether or not the vessel is classed as a barge or a scow, since both are treated the same way."

The Court agrees with the Barge's contention that the 15–20 degree towing angle of the Tug obscured the port light of the Tug as effectively as though her superstructure had done so, and under the Coast Guard letter, which we do not consider controlling, subsection (e) and not subsection (h) applies. Even disregarding the letter, we have found the Barge to be properly lighted.

13. While it is in no way binding upon this Court, the Coast Guard hearings following the collision resulted in a finding that all of the vessels were properly lighted.

notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons." Petition of Dennis T. Sheridan, *supra*, 226 F.Supp. at 138.

"The organization of a corporation for the avowed purpose of avoiding personal responsibility does not of itself, however, justify disregard of the corporate entity." Fletcher, Cyclopedia of Corporations, Vol. 1. Ch. 2, § 41.2, p. 181 (1963 Revised Volume).

It is incumbent upon Claimant Lexington, which would have us pierce the corporate veil, to establish, "by a preponderance of the evidence, that the corporation was an artifice and a sham designed to execute illegitimate purposes in abuse of the corporate fiction and the immunity that it carries. * * *" Coryell v. Phipps, 128 F.2d 702, 704 (5th Cir. 1942), affirmed on other grounds, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943). This it has failed to do.

While there is great similarity between the two entities, in a closely held family corporation the formalities are not as important as where a closely held corporation is not involved. Chambers v. Beaver-Advance Corp., 392 Pa. 481, 492, 140 A.2d 808 (1958); Sharon Herald Co. v. Granger, 97 F.Supp. 295, 301 (W.D.Pa.1951), affirmed on other grounds, 195 F.2d 890 (3rd Cir. 1952). Where an outside party seeks to pierce the veil, the formalities are of little importance.[14] Petition of Dennis T. Sheridan, *supra*, 226 F.Supp. at 139; Hellenic Lines Ltd. v. Winkler, 249 F. Supp. 771, 773, 776 (S.D.N.Y.1966).

With regard to liability under admiralty, rather than corporation, law for navigational faults

"[W]henever the tug, under the charge of her own master and crew, and in the usual and ordinary course of such an employment, undertakes to transport another vessel, which, for the time being, has neither her master or crew on board, from one point to another, over waters where such accessory motive power is necessary or usually employed, she must be held responsible for the proper navigation of both vessels; and third persons suffering damage through the fault of those in charge of the vessels must, under such circumstances, look to the tug, her master or owners, for the recompense which they are entitled to claim. * * *" Sturgis v. Boyer, 65 U.S. (24 How.) 110, 16 L.Ed. 591 (1860).

This remains the law. Tebbs v. Baker-Whiteley Towing Co., 271 F.Supp. 529 (D.Md.1967).

▌ When a tug undertakes to tow an unmanned barge, without independent power, the tug assumes a dominant position with regard to the barge. The Rebecca, 152 F.2d 607 (4th Cir. 1945). It is responsible for exercising reasonable care for the protection and safekeeping of the tow entrusted to it. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932).

▌ The Barge is not responsible for the faults of the Tug.

### V

Finally, the Tug may not limit its liability.

It seeks first, in the event of our finding it liable, to take advantage of the Major-Minor Fault doctrine. This doctrine is clearly *not* followed in this Circuit, a fact admitted by counsel for

---

14. Counsel is apparently suggesting that we find personal liability of certain officer-shareholders of close corporations, regardless of the observance of corporate formalities. This has been suggested, see Note, Should Shareholders Be Personally Liable For The Torts of Their Corpora-

tions, 76 Yale Law Journal 1190 (1967). However, the concept of statutory liability has not been enacted, and the law in this area is clear that no such liability can be imposed, nor can we disregard the corporate forms.

the Tug in its learned, exhaustive and wittily written brief.

The recent case of Norscot Shipping Co. v. Steamship President Harrison, 308 F.Supp. 1100 (E.D.Pa.1970), declared the doctrine unrecognized in this Circuit. *Id.* at 1106, footnote 4. See also Tank Barge Hygrade v. Tug Gatco New Jersey, 250 F.2d 485 (3rd Cir. 1958). The doctrine was applied in The Mamei, 152 F.2d 924 (3rd Cir. 1945), certiorari denied sub nom. Eastern Transport Co. v. Walling, 328 U.S. 836, 66 S.Ct. 981, 90 L.Ed. 1611 (1946). However, only one vessel was at fault in that case.

■ Petitioner insists that he may limit his liability under 46 U.S.C.A. § 183, provided that there is no privity, that is, that the Tug was in all respects seaworthy when it broke ground. Here, Petitioner knew of Captain Patrick's lack of pilotage for these waters, and that he had failed that portion of the Coast Guard examination dealing with area currents and tides. Inasmuch as it was this lack of knowledge which contributed to the collision, Petitioner may not limit his liability.

"If a corporate owner fails to use due diligence to send forth his ship seaworthy in that primitive sense, and the unseaworthiness proximately causes loss or damage, the owner will be denied limitation." Gilmore and Black's The Law of Admiralty (1957) p. 702.

Petitioner cites Petition of Oskar Tiedemann and Co., 179 F.Supp. 227 (D.Del.1959); affd. 289 F.2d 237 (3rd Cir. 1961), as holding that an unlicensed officer does not preclude limitation. The officer there, however, had merely failed to obtain a mail-order Liberian license, which in no way was based upon skill or knowledge. He was a permanently licensed master for all seas. If Captain Patrick had merely neglected to

fill out a form we would not be so impressed as we are by the fact that he failed the tides and currents section of his pilotage examination.

It is clear, therefore, that Petitioner cannot limit his liability.[15]

■ Where, as here, the collision is one of mutual fault, the historic admiralty rule of divided damages will be applied. *See, e. g.,* Halcyon Lines v. Haenn Ship Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952); The North Star, 106 U.S. 17, 1 S.Ct. 41, 27 L.Ed. 91 (1882).

Upon consideration of all of the above, the Court enters the following:

## CONCLUSIONS OF LAW

1. The negligent navigation of the Tug by a captain unfamiliar with the currents of the area, currents which he miscalculated to such a degree that his flotilla was carried into the path of the other colliding vessel, all of which occurred while he was in a fatigued condition, contributed to the collision in such measure as to have been a cause of it.

2. The negligent navigation of the Jacquet, along an illegal course at an illegal speed, without a lookout, contributed to the collision in such measure as to have been a cause of it.

3. The Barge was properly lighted and it is in no way liable for the faults of the Tug.

4. Tug Management Corporation and Sheridan Towing are valid, separate corporate entities.

5. Petitioner's request for limitation of liability must be denied.

6. The rule of divided damages will be applied.

---

15. Petitioner has briefed at length the question of adding the Barge to the limitation fund. There being no right of limitation present, we need not discuss the assets of the fund.